
# CT Corporation

**Service of Process Transmittal**
08/12/2013
CT Log Number 523289336

**TO:**  Michael Johnson, Legal Assistant
The Hartford
690 Asylum Avenue, Ho-1-09
Hartford, CT 06105-3845

**RE:**  **Process Served In Mississippi**

**FOR:**  Hartford Fire Insurance Company (Domestic State: CT)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Mississippi Division, United Sons of Confederate Veterans, Inc., Pltf. vs. Hartford Fire Insurance Company, Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Proof of Service, Complaint, Exhibit(s) |
| **COURT/AGENCY:** | Harrison County Circuit Court - Second Judicial District, MS<br>Case # A240213100 |
| **NATURE OF ACTION:** | Insurance Litigation - Bond - Construction/Contractor's/Payment/Performance/Surety/Miller Act - Plaintiff claims that Hartford materially breached its obligations under the Bond - Seeking damages in excess of a principal amount of $2,260,000.00 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Flowood, MS |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/12/2013 at 12:00 |
| **JURISDICTION SERVED :** | Mississippi |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days from the date of delivery |
| **ATTORNEY(S) / SENDER(S):** | Dewitt M. Lovelace<br>Lovelace and Associates, P.A.<br>12870 US Highway 98 West, Suite 200<br>Miramar Beach, FL 32550<br>850-837-6020 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/12/2013, Expected Purge Date: 08/17/2013<br>Image SOP<br>Email Notification, Michael Johnson MICHAEL.JOHNSON@THEHARTFORD.COM<br>Email Notification, Massimo Fraschilla Massimo.Fraschilla@thehartford.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Amy McLaren |
| **ADDRESS:** | 645 Lakeland East Drive<br>Suite 101<br>Flowood, MS 39232 |
| **TELEPHONE:** | 800-592-9023 |

**LAW DEPARTMENT**

AUG 12 '13

**RECEIVED**

Page 1 of 1 / RA

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**EXHIBIT A**

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT**

**MISSISSIPPI DIVISION, UNITED SONS OF
CONFEDERATE VETERANS, INC.**

**Plaintiff**

A2402-13-100

**CIVIL ACTION NUMBER**

**v.**

**HARTFORD FIRE INSURANCE COMPANY**

**Defendant**

---

**SUMMONS**

---

**THE STATE OF MISSISSIPPI**

**TO:** Hartford Fire Insurance Company
c/o CT Corporation System
645 Lakeland East Drive, Suite 101
Flowood, MS 39232

## N O T I C E T O D E F E N D A N T S

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint, to DEWITT M. LOVELACE, Esquire, the attorney for the Plaintiff, whose address is 12870 Hwy 98 West, Suite 200, Miramar Beach, FL 32550.

Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, this the _____ day of August, 2013.

**MS. GAYLE PARKER
HARRISON COUNTY COURT CLERK**

By: _____

**DEPUTY CLERK**

---

**SUMMONS**
Doc ID: 376439-v1

**Page 1**

## PROOF OF SERVICE -- SUMMONS

I, the undersigned process server, served the Summons and Complaint upon the person or entity named above in the manner set forth below (process server must check proper space and provide all additional information that is requested and pertinent to the mode of service used):

_____ **FIRST CLASS MAIL AND ACKNOWLEDGMENT SERVICE.** By mailing (by first class mail, postage prepaid), on the date stated in the attached Notice, copies to the person served, together with copies of the form of notice and acknowledgment and return envelope, postage prepaid, addressed to the sender (Attach completed ACKNOWLEDGMENT of receipt pursuant to M.R.C.P. Form 1B).

_____ **PERSONAL SERVICE.** I personally delivered copies to _____ on the _____ day of _____, 2013, where I found said person(s) in _____ county of the State of _____

_____ **RESIDENCE SERVICE.** After exercising reasonable diligence I was unable to deliver copies to said person within_____ County, _____. I served the Summons and Complaint on the _____ day of _____, 2013, at the usual place of abode of said person by leaving a true copy of the Summons and Complaint with _____who is the _____(here insert wife, husband, son, daughter or other person as the case may be), a member of the family of the person served above the age of sixteen years and willing to receive the summons and complaint, and thereafter on the _____day of _____, 2013, I mailed (by first class mail, postage prepaid) copies to the person served at his or her usual place of abode where the copies were left.

_____ **CERTIFIED MAIL SERVICE.** By mailing to an address outside Mississippi (by first class mail, postage prepaid, requiring a return receipt) copies to the person served. (Attach signed return receipt or other evidence of actual delivery to the person served.)

At the time of service, I was at least 18 years of age and not a party to this action.

Fee for service: $_____

Process server must list below: [Please print or type]

Name _____
Social Security No. _____
Address _____

Telephone No. _____

State of _____)
County of _____)

Personally appeared before me the undersigned authority in and for the state and county aforesaid, the within named _____ who being first by me duly sworn states on oath that the matters and facts set forth in the foregoing "Proof of Service-Summons" are true and correct as therein stated.

_____
Process Server (signature)

**SWORN TO AND SUBSCRIBED BEFORE ME**, this the _____ day of _____, 2013.


My Commission Expires                          _____
                                                NOTARY PUBLIC

_____

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

MISSISSIPPI DIVISION, UNITED SONS
OF CONFEDERATE VETERANS, INC.

                    **Plaintiff**

v.

HARTFORD FIRE INSURANCE
COMPANY

                    **Defendant**



A2402-13-60

**CIVIL ACTION NUMBER**

FILED

AUG 0 7 2013

GAYLE PARKER
CIRCUIT CLERK

By_____ D.C.

## COMPLAINT

NOW INTO COURT, comes Plaintiff, Mississippi Division, United Sons of Confederate Veterans, Inc. and files its Complaint against Defendant, Hartford Fire Insurance Company, showing unto the Court as follows:

### ALLEGATIONS AS TO ALL COUNTS

### PARTIES

1.     Plaintiff, Mississippi Division, United Sons of Confederate Veterans, Inc. (hereafter "Miss. Div.") is a nonprofit corporation organized and existing under the laws of the State of Mississippi and maintaining its principal business address at 2244 Beach Boulevard, Biloxi, Mississippi 39531. Miss. Div. is qualified to do business and is doing business in the State of Mississippi.

2.     Defendant Hartford Fire Insurance Company ("Hartford") is a corporation organized and existing under the laws of the State of Connecticut. Upon information and belief, Miss. Div. avers that Hartford maintains its principal offices at One Hartford Plaza, Hartford, CT 06155-0001. Hartford is licensed with the Mississippi Insurance

Commissioner to issue surety bonds to construction contractors for work performed in Mississippi, and Hartford does issue such bonds in the State of Mississippi. Hartford is subject to the process of this Court by service upon its registered agent, CT Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over the parties and over the subject matter of this civil action pursuant to Mississippi Constitution Article 6, §156 and Miss Code Ann. §9-7-81 (Rev. 1991) in that the amount in controversy herein exceeds the sum of Two Hundred Dollars ($200.00) and jurisdiction is exclusive in this Court pursuant to Miss. Code Ann. §89-9-21 (Supp. 2012) in that the amount in controversy herein exceeds the sum of Two Hundred Thousand Dollars ($200,000.00), excluding interest and costs.

4. Venue in this Court is proper pursuant to Miss. Code Ann. §11-11-3(1)(a)(i) (Rev. 2004) in that the Second Judicial District of Harrison County, Mississippi is where both a substantial alleged act or omission occurred and a substantial event occurred which caused the damages asserted herein and which form the basis of the Miss. Div.'s cause of action.

5. All conditions precedent to and for this action, if any, have occurred or have been performed.

## FACTUAL BASIS FOR RELIEF REQUESTED

6. Miss. Div. as "Owner" entered into a contract with J.C. Duke & Associates General Contractors, Inc. ("Duke") as "Contractor" dated October 1, 2009, in the amount of Ten Million Four Hundred Eighty-Eight Thousand Dollars ($10,488,000.00) for

construction of the Jefferson Davis Presidential Library and Museum Reconstruction, in Biloxi, Mississippi ("JDPL Project"). A copy of the contract between Miss. Div. and Duke for construction of the JDPL Project ("Contract") is attached to this Complaint as Exhibit "A" (but without voluminous documents attached to or incorporated by reference therein).

7. Hartford, as surety, issued for and on behalf of Duke, as principal, a Contract Bond to Miss. Div., as obligee, in the penal sum of $10,488,000, for completion of the Contract for construction of the JDPL Project, for the payment of labor and material used in the prosecution of the Contract work, and for payment of taxes and assessments (hereafter "Bond"). A copy of Hartford's Bond is attached to this Complaint as Exhibit "B".

8. According to Duke's "schedule of values" for Contract billing, under item number 01710, the Hartford Bond cost $120,750.00 for which the Miss. Div. make payment to Duke. Therefore, the Miss. Div. paid $120,750.00 to get the protection of Hartford's Bond.

9. Hartford's Bond at Part II constitutes a PERFORMANCE BOND which provided in relevant part as follows:

> Whenever the Owner [i.e. Miss. Div.] has performed its obligation but the Principal [i.e. Duke] has defaulted under the terms of the Contract, or any portion thereof, and the Owner has declared the Principal to be in default, the Surety [i.e. Hartford] shall promptly:
>
> 1. Remedy the default, or
>
> 2. Complete the Contract in accordance with its terms and conditions; or

3. Procure the completion of the Contract in accordance with its terms and conditions.

Even if there should be a succession of defaults, the Surety is responsible for completion of the Contract.

The Surety shall provide sufficient funds to pay the cost of completion of the Contract in its entirety including other costs and damages for which the Surety may be liable there under (sic), less the balance of the Contract price. The term 'balance of the Contract price' as used in this paragraph shall mean the total payable by the Owner to Principal under the Contract and any Change Orders thereto, less the amount paid by Owner to Principal.

See Exhibit "B" hereto (emphasis and bracketed explanations added).

10.     Hartford's Bond at Part V, paragraph 1 stated that "The Performance Bond is for an amount equal to the full amount of the Contract" which equated to a penal sum for Hartford's Performance Bond obligations in the amount of $10,488,000.00. See Exhibit "B" hereto.

11.     The Contract between Miss. Div. and Duke at section 3.3 required Duke to achieve Substantial Completion of the entire work not later than Five Hundred Fifty (550) days from date of commencement. The date of commencement was fixed by a Notice to Proceed dated October 15, 2009, which meant that the original date for Substantial Completion was April 18, 2011.

12.     Contract Change Order Number 001 revised the Substantial Completion date to May 16, 2011.

13.     The Contract at section 3.3 specified liquidated damages of $500 per calendar day for every calendar day Substantial Completion was achieved by Duke later than the specified date, as adjusted (in this case being $500 per day for every calendar day past May 16, 2011, that Substantial Completion had not been achieved).

14.    Although Duke did not perform the Contract in a timely manner, Duke did man and endeavor to perform the Contract until August 10, 2012, when Duke, without legal justification, abandoned the Contract to construct the JDPL Project.

15.    As of the date of Duke's abandonment of the JDPL Project on August 10, 2012, Duke owed Miss. Div. liquidated damages of $226,000 (May 16, 2011, adjusted completion date – August 10, 2012, date of abandonment = 482 calendar days x $500 per day = $226,000). As provided by the Bond, these liquidated damages represented "other costs and damages for which the Surety [i.e. Hartford] may be liable" under the terms of the Contract. See Exhibit "B", Section II, Performance Bond.

16.    Upon information and belief, Miss. Div. avers that Duke was forced to abandon the Contract because of a lack of funds which were under Hartford's control pursuant to an Order Approving Use of Bonded Receivables Cash Collateral and Providing Adequate Protection dated March 20, 2012, issued by the U.S. Bankruptcy Court for the Southern District of Alabama, Southern Division, In Re: J.C. Duke & Associates General Contractors, Inc., Case No. 12-00391.

17.    Upon information and belief, Miss. Div. avers that Hartford and Duke were in negotiations throughout August 2012, concluding with Hartford's denying financing to Duke. Hartford knew Duke needed this financing to complete the JDPL Project, and Hartford knew its denial of financing would force Duke to default on the JDPL Project before it could be completed.

18.    Upon information and belief, Miss. Div. avers that in denying to Duke the financial ability to complete the JDPL Project, Hartford was looking out for its own pocketbook instead of Hartford's obligations to the Miss. Div. under the Bond.

---

**COMPLAINT**
Doc ID: 376439-v1

19. On August 17, 2012, Duke wrote to the Miss. Div. to advise that Hartford's "grievous action" in causing all of Duke's cash receivables on bonded projects to be redirected from Duke to Hartford, including those under the subject Contract, made "it impossible for [Duke] to continue paying for activities related to completing bonded projects," including the Contract to construct the JDPL Project. Duke further stated that because of Hartford's "ruthless path", Duke "has suspended all services and payments" and that "Hartford's actions will undoubtedly prevent the timely completion of the projects and prompt payment to vendors and subcontractors." See Exhibit "C" hereto (attachment).

20. Beginning in the week after Duke's abandonment on August 10, 2012, of the Contract to construct the JDPL Project, representatives of Miss. Div. began attempting to contact representatives of Hartford about Hartford's discharging its obligations under the Bond to finish the Project which was at a stage of "near completion", and Miss. Div. urged Hartford to "bring this Project to full completion without delay."

21. Without responding to Miss. Div.'s requests or otherwise agreeing to take prompt action to complete the JDPL Project, on August 16, 2012, counsel for Hartford wrote the Miss. Div. demanding payment of "any and all remaining contract funds, including retainage . . . directly to Hartford, as surety . . . ." This demand was contrary to Hartford's obligations under the Bond and set the stage for Hartford's actions thereafter in which Hartford continually sought to protect its own pocketbook rather than to fulfill Hartford's obligations to Miss. Div. under Hartford's Bond.

22. By letter dated August 31, 2012, counsel for the Miss. Div. wrote counsel for Hartford urging Hartford "to rectify Duke's default as promptly as possible" so as to finish the estimated 30-45 days of work remaining and complete the Project before the long-planned fund raiser set for November 8, 2012. Hartford was warned of the "devastating" adverse consequences that not completing the JDPL Project by the November 8, 2012 fund raiser would have on the finances and credibility of the Miss. Div. This August 31, 2012 letter is attached as Exhibit "C" hereto.

23. By letter dated September 5, 2012, counsel for the Miss. Div. wrote counsel for Hartford to reiterate that the Miss. Div. was "in a terrible bind" and "needs Hartford to get involved immediately to rectify this situation". This September 5, 2012, letter is attached as Exhibit "D" hereto.

24. By letter dated September 10, 2012, Miss. Div. wrote Duke a formal letter of "Declaration and Notice of Default Termination". This September 10, 2012 letter is attached as Exhibit "E" hereto.

25. On September 12, 2012, more than a month after Duke abandoned the Contract to perform the JDPL Project, counsel for Miss. Div. e-mailed counsel for Hartford as follows: "Tom: What exactly can be expected from Hartford by when? My client feels just as abandoned by Hartford as they were by Duke".

26. Not until September 18, 2012, nearly six weeks after Duke abandoned the JDPL Project, did Hartford representatives make themselves available to meet with representatives of the Miss. Div. and to examine the Project.

27.     On the day before the September 18 meeting at the Project, attorneys for Hartford sent counsel for the Miss. Div. a draft version of a "Takeover Agreement", unilaterally proposed by Hartford to be entered into between the Miss. Div. and Hartford with respect to completion of Duke's defaulted obligations under the Contract. This draft "Takeover Agreement" materially prejudiced Miss. Div.'s rights and entitlements under the Bond by, among other things, requiring the Miss. Div. to relinquish its entitlement to liquidated damages, then in excess of $200,000, owed by Duke under the Contract and for which Hartford was liable.

28.     In response to the proposed "Takeover Agreement", counsel for Miss. Div. immediately e-mailed Hartford's attorney on September 17, 2012: "The parties already have an agreement. It's called a Bond. Hartford needs to comply with its terms. No other agreement is needed and certainly not the one you have tendered."

29.     Despite Miss. Div.'s rejection on September 17, 2012 of a "Takeover Agreement" (which is nowhere provided in the terms of Hartford's Bond and which materially altered the protections thereof), Hartford continued to demand that the Miss. Div. sign a takeover agreement with terms prejudicial to the Miss. Div. and at variance the Bond which Hartford had issued to the Miss. Div., as obligee.

30.     On September 25, 2012, Hartford requested the Miss. Div. to provide a list of "red alert" priority items that needed to be addressed in order of importance and immediacy. Miss. Div. responded with the requested list the next day, September 26, 2012. See Exhibit "F".

31.     Also, on September 25, 2012, counsel for Hartford sent counsel for Miss. Div. another unauthorized takeover agreement which was contrary to the plain language

of the Bond, which contained statements known to be false to Hartford, and which imposed conditions that Hartford knew to be objectionable to the Miss. Div. In response, counsel for Miss. Div. e-mailed counsel for Hartford stating "Why are you sending this to me? I've already told you, and I reiterated to Mr. Blackmon and Mr. Judd [Hartford representatives] at the Beauvoir meeting you missed that the parties already have an agreement called a Bond."

32. Despite having been told at least twice in writing and again orally at the Project site meeting that the Miss. Div. would not sign any further agreements which compromised the Miss. Div.'s rights under the Bond, counsel for Hartford sent to counsel for Miss. Div. on September 26, 2012, yet another takeover agreement, disguised in letter form, with the same provisions and conditions which Hartford already knew to be objectionable to Miss. Div. In response, counsel for Miss. Div. wrote counsel for Hartford a letter dated September 26, 2012, stating among other things:

> If, as I understand your letter, Hartford is willing to undertake
> Its Bond obligations only subject to these conditions contrary
> to the Bond, then Hartford is in breach of the Bond and acts
> in bad faith.

See Exhibit "G" hereto.

33. On September 28, 2012, Hartford sent yet another form of takeover agreement, to which Miss. Div. responded the same day:

> For the fifth or maybe sixth time, the Obligee [Miss. Div.] is
> not signing another agreement with Hartford that could be
> argued to alter the terms of the Bond. Hartford needs to
> proceed with completion of the Project as required by the
> Bond.

See Exhibit "H" hereto.

34.    On Friday night, September 28, 2012 (now seven weeks after Duke abandoned the Project), counsel for Hartford e-mailed counsel for Miss. Div. making the insulting and false assertion that the Miss. Div.'s "refusal to sign the [takeover] agreement is preventing [Hartford] from proceeding with completion of the project." See Exhibit "I" hereto.

35.    Counsel for Miss. Div. responded the same night stating that Hartford had repeatedly failed to respond to Miss. Div.'s request to point out where in the Bond there is any requirement of a separate takeover agreement; outlining the cooperation given by the Miss. Div. without reciprocation from Hartford; and concluding:

> The [Miss. Div.] has given Hartford everything the Bond reasonably requires.  If Hartford refuses to proceed, the consequences of that decision will be Hartford's responsibility to bear.  All we ask is that Hartford do what the Bond requires and act promptly to remedy the default of the contractor which Hartford has bonded.

See Exhibit "I" hereto.

36.    On October 5, 2012, counsel for Hartford sent in letter form yet another proposed takeover agreement.  See Exhibit "J" hereto.  In this proposed agreement, Hartford stated, in part, as follows: "Hartford is willing to undertake to complete all work . . . provided that the entire unpaid contract balance . . . is paid to Hartford . . . ."  This was a material modification of the terms of the Bond which expressly provided that Hartford was liable for "other costs and damages" under the Contract and that the amount payable to Hartford was "the total amount payable by the Owner [Miss. Div.] to the Principal [Duke] under the Contract", which amount would necessarily be reduced by the liquidated damages owed by Duke to Miss. Div.

37. By letter dated October 9, 2012 (Exhibit "K" hereto), counsel for Miss. Div. responded that Hartford had still failed to point out the requirement in the Bond for such a takeover agreement, which was subsequent to and separate from the Bond and which materially altered provisions in or imposed conditions detrimental to the Miss. Div. that were unstated in the Bond. Counsel for Miss. Div. noted that just like all the other takeover agreements drafted by Hartford, the one proposed on October 5, 2012, sought to enable Hartford to grab all the money, including over $200,000 in liquidated damages to which the Bond entitled the Miss. Div. to recover in accordance with the terms of the Contract. Counsel for Miss. Div. further responded to the tender by counsel for Hartford of yet another takeover agreement: "Why did you even bother with submitting such an insulting suggestion that you know is completely uncalled for by the Bond and totally unacceptable to the Obligee? See Exhibit "K" hereto.

38. Nonetheless, despite repeated objections for nearly a month and in order to alleviate the artificial impasse Hartford had manufactured by its unreasonable demands for a takeover agreement, counsel for the Miss. Div. also included with his response letter of October 9, 2012, a version of a takeover agreement which Miss. Div. would accept. See Exhibit "K" hereto.

39. In e-mail exchanges, counsel for Miss. Div. on October 10, 2012 assured counsel for Hartford as follows:

> In any event, unlike Hartford, the Obligee [Miss. Div.] is not requiring Hartford to concede a single solitary thing. Both parties reserve rights as to all issues. The[re] is no good faith reason, none, for Hartford to delay proceeding with the completion of the work as is its obligation under the Bond it issued.

See Exhibit "L" hereto.

40.    Having heard nothing further from Hartford, counsel for the Miss. Div. e-

mailed counsel for Hartford on October 15, 2012, as follows:

> I'm meeting with the Beauvoir [i.e. Miss. Div.] Board of
> Directors tomorrow morning. We're out of time. Decisions
> have to be made.
>
> Is there anything I can tell them as to whether Hartford
> intends to honor its Bond without forcing the Obligee [i.e.
> Miss. Div.] to waive or compromise any of its rights? The
> Obligee [Miss. Div.] is not asking Hartford to make any
> concessions or to waive any rights. Why isn't Hartford
> willing to proceed with its completion obligations on the
> same basis? If Hartford is so willing, when can the Obligee
> expect Hartford to get started?

See Exhibit "M" hereto.

41.    On the same day, October 15, 2012, counsel for Hartford wrote counsel

for Miss. Div. making the insulting and incredible claim that because of Miss. Div.'s

"unreasonable demands upon Hartford", Hartford refused to honor its obligations under

the Bond to complete or to arrange completion of the JDPL Project. See Exhibit "N"

hereto. In truth, the only demand the Miss. Div. ever made on Hartford was to do what

its Bond required.

42.    By letter dated October 29, 2012 (Exhibit "O" hereto), counsel for Miss.

Div. replied to Hartford's disavowel of Bond obligations letter of October 15, 2012,

pointing out Hartford's false statements, misrepresentations, insults, and bad faith

decision to walk away from its Bond obligations (which Miss. Div. paid $120,750 to

secure).

43.     Hartford's disavowel of Bond obligations letter of October 15, 2012 (Exhibit "N" hereto) was full of maliciously false statements, blatant misrepresentations, and insults, including but not limited to a shameless attempt to blame Miss. Div. for Duke's delays, incomplete and deficient work, and other defaults for which Hartford was liable under the Bond.

44.     Hartford's unjustified abandonment of its obligations under the Bond created tremendous hardships for Miss. Div. which Hartford knew or should have known it was creating, including but not limited to:

a.      Miss. Div. had no construction professionals on its staff, instead relying upon Duke and, following Duke's default, upon Hartford to provide the construction expertise and capacity needed to complete the JDPL Project.

b.      Incompleted areas of the JDPL Project allowed water to infiltrate areas of the JDPL, but Miss. Div. did not have the knowledge or means to determine what needed to be done to stop such water penetrations.

c.      Miss. Div. did not have access to Duke's files to know what subcontractors had which obligations with respect to completion of the JDPL Project nor to determine how much was still owed to such subcontractors.

d.      Because Duke had abandoned the JDPL Project on August 10, 2012, but no action had been taken by Hartford for over two months to resume completion of the JDPL Project, Duke's subcontractors

and suppliers were making payment demands upon the Miss. Div.,
refusing to return to work, and removing materials and equipment
from the JDPL Project.

e.  Nothing had been done by Hartford at the JDPL Project, including
the "red alert" priority items which Hartford had requested and Miss.
Div. had furnished on September 26, 2012 (Exhibit "F" hereto).
Three weeks later, these items, known by Hartford to have a "red
alert" priority, were in the same unfinished condition, Hartford
having done nothing about them.

f.  By cynically waiting until October 15, 2012 to disavow its Bond
obligations to the Miss. Div., Hartford left the Miss. Div. with no
practical way to get the JDPL Project ready for the critical
fundraising event on November 8, 2012, about which Miss. Div. had
given notice to Hartford six weeks earlier on August 31, 2012
(Exhibit "C" hereto).

g.  Miss. Div. was being subjected to additional costs and liabilities and
tremendous uncertainties and anxieties which would have been
completely avoided if Hartford had promptly and fully honored its
Bond obligations.

h.  Because Hartford failed to proceed with completion of the JDPL
Project – the one thing its Performance Bond obligated Hartford to
do, Miss. Div. paid $120,750 for the premium to secure the
protection of Hartford's Bond but got nothing in return.

45.    Hartford's unjustified abandonment of its obligations under the Bond and especially coupled with Hartford's knowingly false and insulting assertions in its Bond disavowal letter of October 15, 2012, was an independent tort and constituted bad faith under Mississippi law.

46.    Because of Hartford's bad faith abandonment of its Bond obligations, the Miss. Div. was forced, on its own, to seek another contractor to complete the JDPL Project.

47.    Miss. Div. hired Roy Anderson Corp as its construction manager to work with those subcontractors of Duke willing to return to the JDPL Project and to engage other subcontractors in place of Duke's subcontractors which were unwilling to return in order to complete the JDPL Project.

48.    Because of the lack of Duke's files and information, completion of the JDPL Project was an administrative nightmare, which put great strain on representatives of the Miss. Div.

49.    While significant deficiencies still existed in work and installations performed by Duke prior to its abandonment of the job on August 10, 2012, Miss. Div. with the assistance of Roy Anderson Corp arranged for work to be complete enough to permit the JDPL Project to be occupied and used for its intended purpose – the definition of "Substantial Completion" – on February 4, 2013.

50.    As of the February 4 date of Substantial Completion, additional liquidated damages of $89,000 were owed under the Contract from the period after Duke's default of August 10, 2012 until Substantial Completion on February 4, 2013. (August 10, 2012 – February 4, 2013 = 178 calendar days x $500 per day = $89,000).

51.     The total liquidated damages owed under the Contract for which Hartford is liable therefore totaled $315,000.  See paragraphs 15 and 50 of this Complaint.

52.     The Miss. Div. incurred out of pocket costs (excluding attorneys' fees) to complete the work abandoned by Duke in an amount which was $14,357.48 in excess of the remaining, adjusted Contract balance at the time of Duke's abandonment. Hartford is liable under its Bond for this cost in excess of Contract balance.  See Exhibit "Q" hereto.

53.     While the JDPL Project could be occupied, there remained substantial, unremedied deficiencies in the work performed by Duke or by subcontractors on Duke's behalf prior to Duke's abandonment of the JDPL Project, for which Duke is liable under the Contract and for which Hartford is liable under its Bond.   These unremedied deficiencies consist of discoloration and unacceptable variations in the appearance of the exterior stone on the JDPL Project; widespread water intrusion through improperly performed work for the JDPL exterior envelope (i.e. walls, windows, and roofing); and unacceptable darkness and shade variations in the exterior granite portraits and state seals medallions.

54.     The currently estimated cost to remedy these remaining deficiencies is in excess of $2,250,000.  See Exhibit "Q" hereto.

55.     In addition, the Miss. Div. has incurred attorneys' fees and related expenses in excess of one hundred thousand dollars ($100,000), which are continuing, in being forced to deal with the myriad legal issues created by Duke's abandonment of the JDPL Project, by Hartford's abandonment of the obligations of its Bond, and by completion of the JDPL Project without any assistance whatsoever from Hartford.

56.    Miss. Div. provided to Hartford cost reconciliations and extensive supporting backup information concerning the costs and damages set forth in paragraphs 51-54 by letters dated July 10, 2013 and July 30, 2013, attached as Exhibits "P" and "Q" hereto (without voluminous attachments).

57.    Through this correspondence (Exhibits "P" and "Q" hereto), Miss. Div. made demand upon Hartford to pay the referenced costs and damages and further gave notice to Hartford of the Miss. Div.'s reservation of "all rights to consequential, exemplary, and punitive damages as a result of Hartford's bad faith abandonment of its Bond obligations and other improper conduct toward the [Miss. Div.]". See Exhibits "P" and "Q" hereto.

58.    As of the date of filing this Complaint, Hartford has offered no substantive response to either of Miss. Div.'s notice and demand letters, Exhibits "P" and "Q" hereto.

## COUNT I:

## CLAIM FOR COMPENSATORY DAMAGES

59.    Miss. Div. adopts and incorporates into this Count I by reference in their entirety the averments of paragraph 1-58 of this Complaint and for its Count I, Miss. Div. further alleges as follows.

60.    Hartford materially breached its obligations under the Bond issued to Miss. Div. as Obligee.

61.    Hartford is liable to Miss. Div. for compensatory damages consisting of:

a.    Miss. Div.'s costs to complete the JDPL Project in excess of the unpaid balance remaining in Duke's Contract, adjusted for liquidated damages owed by Duke and thus by Hartford. At the time of filing this Complaint, these excess costs are in the principal

sum of $14,357.48, the exact amount to be shown at trial, which amount is subject to adjustment as further costs are incurred or as additional information becomes available.

b. Costs to repair unremedied deficiencies in the exterior stone, in improper work or materials which allow water penetration through the exterior envelope, and in the exterior portraits and state seals medallions. At the time of filing this Complaint, the estimated cost to remedy these remaining deficiencies exceeds $2,250,000, the exact amount to be shown at trial, which amount is subject to adjustment as additional information becomes available.

62. WHEREFORE, PREMISES CONSIDERED, Miss. Div. demands judgment of and from Hartford under this Count I for compensatory damages in excess of a principal amount of $2,260,000, the exact amount to be shown and determined at trial.

**COUNT II:**

**CLAIM FOR ATTORNEYS' FEES**

63. Miss. Div. adopts and incorporates into this Count II by reference in their entirety the averments of paragraphs 1-62 of this Complaint and for its Count II, Miss. Div. further alleges as follows.

64. Hartford's abandonment of its Bond obligations owed to Miss. Div. was an intentional wrong done with actual malice and insult, undertaken in a deliberate effort to coerce Miss. Div. into surrendering its rights under the Bond and evincing a wanton and ruthless disregard both of the rights of the Miss. Div. and of Hartford's obligations owed to the Miss. Div. as obligee under Hartford's Bond.

**COMPLAINT**
Doc ID: 376439-v1

65. A significant purpose for which the Bond was obtained in the first place is frustrated if, in order to obtain the benefits of the Bond, an obligee thereunder – like the Miss. Div. – is forced to engage in costly and time consuming litigation.

66. Sureties like Hartford face a minimal incentive to perform their Bond obligations if the maximum loss they may incur is the amount of compensatory damages already owed under the Bond, especially since the transaction costs of litigation are likely to dissuade obligees like Miss. Div. from otherwise seeking relief for full payment in court.

67. Sureties like Hartford would be advantaged by refusing to make payments or to perform obligations if not liable for the transaction costs of litigation that keep obligees from pursuing in court their right to payment.

68. Attorneys' fees and related expenses are a real cost incurred by Miss. Div. which were forced upon the Miss. Div. because of Hartford's completely unjustified abandonment of its Bond obligations.

69. Under Mississippi law, Hartford is liable for the full measure of the reasonably foreseeable consequences of its actions. It was entirely foreseeable by Hartford that Miss. Div. would have incurred additional inconvenience and expense, including attorneys' fees and related expenses, both in the immense effort required to complete the JDPL Project after Hartford's unjustified abandonment of its obligations under the Bond and in undertaking this action to rectify the injuries caused to the Miss. Div. as a result of Hartford's abandonment of its Bond. Pursuant to Mississippi law, under these circumstances, "[i]t is no more than just that the injured party be compensated for these injuries."

70.     WHEREFORE, PREMISES CONSIDERED, Miss. Div. demands judgment
of and from Hartford under this Count II for:

(a)     attorneys fees and related expenses in a principal amount in
excess of one hundred thousand dollars ($100,000) incurred by
Miss. Div. from the time of Duke's abandonment of the JDPL
Project, as a result of (i) legal work associated with Miss. Div.'s
persistent efforts to obtain performance by Hartford of its Bond
obligations, (ii) legal assistance provided to Miss. Div. to complete
the JDPL Project once Hartford abandoned its Bond obligations,
and (iii) legal support of the Miss. Div. in connection with Project
completion, documenting and dealing with issues, and making
demands upon Hartford up through the filing of this Complaint, the
exact amount to be shown at trial; and

(b)     the transaction costs, including attorneys' fees and expenses, of
this litigation made necessary by Hartford's abandonment of its
Bond obligations and nonresponse to the Miss. Div.'s demands for
payment and for remedying of still remaining deficiencies in Duke's
work for which Hartford is liable under its Bond.

## COUNT III:

## CLAIM FOR PUNITIVE DAMAGES

71. Miss. Div. adopts and incorporates into this Count III by reference in their entirety the averments of paragraphs 1-70 of this Complaint and for its Count III, Miss. Div. further alleges as follows.

72. Hartford's abandonment of its Bond obligations owed to Miss. Div. lacked an arguable or legitimate basis, and Hartford's abandonment was a willful wrong undertaken with actual malice in an insulting and abusive manner in a deliberate effort to coerce Miss. Div. to surrender its rights under the Bond and with wanton and reckless disregard for Miss. Div.'s rights under Hartford's Bond, so as to constitute an independent tort.

73. Throughout this matter, Hartford acted with sole regard to its own interests to the detriment and utter disregard of the interests of Miss. Div. to whom Hartford owed clear and specific obligations under the Bond. Hartford therefore acted with improper motive and dishonest purpose.

74. When a commercial surety like Hartford refuses without justification its performance and duties under the Bond it issues and for which it received substantial payment, contract damages alone do not compensate an obligee like the Miss. Div. for the commercial surety's misconduct and have no deterrent effect to prevent such conduct in the future. Without such a deterrent, a surety would have every motive to delay or deny payment or refuse to honor its performance obligations under its Bond if its only potential liability was for actual contract damages alone.

75.   Hartford's conduct toward Miss. Div. was so egregious and outrageous as to be tantamount to fraud.

76.   Hartford is a primary member of a conglomerate referred to as "The Hartford". At 12/31/2011, The Hartford reported in its 10K filing a net worth of $22,910,000,000.

77.   Pursuant to <u>Miss. Code Ann</u>. §11-1-65(3)(a)(i)(Supp. 2012), Hartford is subject to punitive damages of $20 million.

78.   WHEREFORE, PREMISES CONSIDERED, Miss. Div. demands judgment of and from Hartford under this Count III for punitive damages in the amount of Twenty Million Dollars ($20,000,000.00).

## PRAYER FOR RELIEF

79.   Miss. Div. adopts and incorporates by reference in their entirety the averments of paragraphs 1-78 of this Complaint and prays for relief as follows.

   a.   compensatory damages against Hartford under Count I for an amount in excess of the principal sum of $2,260,000;

   b.   extra contractual damages against Hartford under Count III for attorneys' fees and related expenses incurred prior to the filing of this action in a principal amount in excess of $100,000 and for the transaction costs of this litigation in an amount to be determined;

   c.   punitive damages against Hartford under Count IV in the amount of $20,000,000;

   d.   pre-judgment interest as permitted by law;

   e.   post-judgment interest on sums awarded as provided by law; and

f.   such other, further, additional, and general relief as this Court

deems just and proper.

DATED: THIS the ___b⁴ʰ___ day of August, 2013.

Respectfully submitted,

**MISSISSIPPI DIVISION, UNITED SONS
OF CONFEDERATE VETERANS, INC.**

By:   _____

Dewitt M. Lovelace (MSB# 1449)
Lovelace and Associates, P.A.
12870 US Hwy 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Fax: (850) 837-4093
E-Mail: courtdocs@lovelacelaw.com
Attorney for Plaintiff, Mississippi Division,
United Sons of Confederate Veterans, Inc.

<u>OF COUNSEL:</u>

Gary Yarborough, Jr. (MSB #102310)
Yarborough Law Firm, PLLC
845-B Highway 90
Bay St. Louis, MS 39520
Telephone: (228) 467-5771
Fax: (228) 467-5774
E-Mail: ylf.gary.yarborough@att.net

# ■AIA® Document A101™ — 2007

## Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum

AGREEMENT made as of the First day of October in the year Two Thousand Nine
*(In words, indicate day, month and year.)*

BETWEEN the Owner:
*(Name, legal status, address and other information)*

Mississippi Division, United Sons of Confederate Veterans, Inc.
2244 Beach Blvd.
Biloxi, Mississippi 39531
Telephone Number: 228-388-9074
Fax Number: 228-388-7084

and the Contractor:
*(Name, legal status, address and other information)*

J. C. Duke & Associates General Contractors, Inc.
1716 Industrial Park Drive
Mobile, Alabama 36693
Telephone Number: 251-661-4888
Fax Number: 251-661-1181

for the following Project:
*(Name, location and detailed description)*

Jefferson Davis Presidential Library and Museum Reconstruction
Biloxi, Mississippi
Reconstruction of the Jefferson Davis Presidential Library/Museum
damaged in Hurricane Katrina

The Architect:
*(Name, legal status, address and other information)*

Albert & Associates Architects, PA
514 Main Street
PO Box 1567
Hattiesburg, MS 39403
Telephone Number: 601-544-1970
Fax Number: 601-544-4714

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.



RECEIVED

OCT 7   2009

Albert & Associates
ARCHITECTS

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:23:03 on 10/01/2009 under Order No.2959873453_1 which expires on 08/27/2010, and is not for resale.
User Notes:                                                                                                    (1114399607)

EXHIBIT

**A**

TABLE OF ARTICLES

1    THE CONTRACT DOCUMENTS

2    THE WORK OF THIS CONTRACT

3    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4    CONTRACT SUM

5    PAYMENTS

6    DISPUTE RESOLUTION

7    TERMINATION OR SUSPENSION

8    MISCELLANEOUS PROVISIONS

9    ENUMERATION OF CONTRACT DOCUMENTS

10   INSURANCE AND BONDS

**ARTICLE 1   THE CONTRACT DOCUMENTS**
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than a Modification, appears in Article 9.

**ARTICLE 2   THE WORK OF THIS CONTRACT**
The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

**ARTICLE 3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
§ 3.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

The Commencement Date will be fixed in a Notice to Proceed

If, prior to the commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than Five Hundred Fifty ( 550 ) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:55:22 on 10/01/2008 under Order No.2959873483_1 which expires on 08/27/2010, and is not for resale.
User Notes:                                                                                                    (1227913270)

Init.

2

| Portion of Work | Substantial Completion Date |
|---|---|

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus payments for early completion of the Work.)*

Liquidated Damages: Five Hundred Dollars ($500.00) Per Day

## ARTICLE 4  CONTRACT SUM
§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Ten Million Four Hundred Eighty-Eight Thousand Dollars ($ 10,488,000.00), subject to additions and deductions as provided in the Contract Documents.

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

Base Bid:          $10,488,000.00          Attached Contractor's Form of Proposal Exhibit "A"

§ 4.3 Unit prices, if any:
*(Identify and state the unit price; state quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($0.00) |
|---|---|---|
| Duplex Outlet | Each | 40.00 |

§ 4.4 Allowances included in the Contract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|---|---|
| Door Hardware | $125,000.00 |
| Signage | $50,000.00 |

## ARTICLE 5  PAYMENTS
§ 5.1 PROGRESS PAYMENTS
§ 5.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 5.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

Submitted on the 25th and paid by the following 10th day of the following month

§ 5.1.3 Provided that an Application for Payment is received by the Architect not later than the day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the   day of the  month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than ) days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:56:22 on 10/01/2009 under Order No.2969873481_1 which expires on 08/27/2010, and is not for resale.
User Notes:                                                                                                                        (1227913270)

Init.

/

3

by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**§ 5.1.5** Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**§ 5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of Five Percent percent ( 5 %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201™–2007, General Conditions of the Contract for Construction;

.2  Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of Five percent ( 5 %);

.3  Subtract the aggregate of previous payments made by the Owner; and

.4  Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

**§ 5.1.7** The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

.1  Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
*(Section 9.8.5 of AIA Document A201–2007 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

.2  Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201–2007.

**§ 5.1.8** Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

N/A

**§ 5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ 5.2 FINAL PAYMENT**
**§ 5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when

.1  the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201–2007, and to satisfy other requirements, if any, which extend beyond final payment; and

.2  a final Certificate for Payment has been issued by the Architect.

**§ 5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:56:22 on 10/01/2009 under Order No.2958873483_1 which expires on 08/27/2010, and is not for resale.
User Notes:                                                                                        (1227813270)

4

## ARTICLE 6 DISPUTE RESOLUTION
### § 6.1 INITIAL DECISION MAKER
The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to this Agreement, to serve as Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

### § 6.2 BINDING DISPUTE RESOLUTION
For any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[ ]     Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[ X ]     Litigation in a court of competent jurisdiction

[ ]     Other *(Specify)*

## ARTICLE 7 TERMINATION OR SUSPENSION
### § 7.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

### § 7.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007.

## ARTICLE 8 MISCELLANEOUS PROVISIONS
### § 8.1 Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

### § 8.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

%

### § 8.3 The Owner's representative:
*(Name, address and other information)*

Mr. Richard V. Forte, Sr., Acting Director and Board Chairman
Combined Boards of Beauvoir
2244 Beach Boulevard
Biloxi, Mississippi 39531
Phone: 228-388-9074
Fax: 228-388-7084
### § 8.4 The Contractor's representative:
*(Name, address and other information)*


Init.

/

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:56:22 on 10/01/2009 under Order No.2969873483_1 which expires on 08/27/2010, and is not for resale.
User Notes:                                                                                              (1227913270)

5

Allen Helms – Project Manager
J.C. Duke & Associates General Contractors, Inc.
1716 Industrial Park Drive
Mobile, Alabama, 36693
Phone: 251-661-4888
Fax: 251-661-1181

**§ 8.5** Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

**§ 8.6** Other provisions:

N/A

## ARTICLE 9 ENUMERATION OF CONTRACT DOCUMENTS

**§ 9.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

**§ 9.1.1** The Agreement is this executed AIA Document A101-2007, Standard Form of Agreement Between Owner and Contractor.

**§ 9.1.2** The General Conditions are AIA Document A201-2007, General Conditions of the Contract for Construction.

**§ 9.1.3** The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|----------|-------|------|-------|
|          |       |      |       |

**§ 9.1.4** The Specifications:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*
Exhibit "B" – Index of Specifications

| Section | Title | Date | Pages |
|---------|-------|------|-------|
|         |       |      |       |

**§ 9.1.5** The Drawings:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
Exhibit "C" – Index of Drawings

| Number | Title | Date |
|--------|-------|------|
|        |       |      |

**§ 9.1.6** The Addenda, if any:

| Number | Date | Pages |
|--------|------|-------|
| 1 | September 8, 2009 | 12 |
| 2 | September 11, 2009 | 13 |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 9.

**§ 9.1.7** Additional documents, if any, forming part of the Contract Documents:

 .1 AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

**AIA Document A101™ – 2007.** Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 10:56:22 on 10/01/2009 under Order No.2968673483_1 which expires on 08/27/2010, and is not for resale.
User Notes:                          (1227913270)

Init.
/

Exhibit "D" – Copy of Albert & Associates Architects, P.A. Standard release form to transfer data in electronic format to a third party.

.2    Other documents, if any, listed below:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

## ARTICLE 10  INSURANCE AND BONDS

The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of insurance or bond | Limit of liability or bond amount ($0.00) |
|---|---|
| Hartford Fire Insurance Company | $10,488,000.00 |

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*

Mr. Richard V. Forte, Sr., Acting Director and
Chairman of the Combined Boards of Beauvoir
*(Printed name and title)*

CONTRACTOR *(Signature)*

Mr. James C. Duke, President
*(Printed name and title)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:56:22 on 10/01/2009 under Order No.2959873483_1 which expires on 03/27/2010, and is not for resale.
User Notes: (1227913270)

Init.

7

# ALBERT & ASSOCIATES ARCHITECTS

514 Main Street
P.O. Box 1567
Hattiesburg, MS 39403

Telephone: 601.544.1970
Facsimile: 601.544.4714

a@albertassociates.com
www.albertassociates.com

October 15, 2009
## NOTICE TO PROCEED
### FOR
### JEFFERSON DAVIS PRESIDENTIAL LIBRARY RECONSTRUCTION
### BILOXI, MISSISSIPPI

On behalf of the Owner for the above project, we authorize you to begin construction on OCTOBER 15, 2009. Please, acknowledge your acceptance below and return to my office.

Sincerely,

Larry A. Albert, AIA
Albert & Associates Architects, PA


ACCEPTED BY:

Name and Title
James C. Dukes

*Oct 16, 2009*
Date


Cc: Mr. Richard V. Forte, Sr. Acting Director and
Chairman of the Combined Board of Beauvoir



RECEIVED

OCT 2 2 2009

Albert & Associates
ARCHITECTS

Albert & Associates Architects, P.A.
A&A Prj. 06414
9 April 2009

Jefferson Davis Presidential Library Reconstruction
Damaged in Hurricane Katrina
Biloxi, Mississippi

SECTION 00600

CONTRACT BOND

I. PREAMBLE

KNOW ALL MEN BY THESE PRESENTS: THAT ___J. C. Duke & Associates General Contractors, Inc.___
Principal, a ___Corporation_____, residing at
___Mobile, Alabama_____ authorized to do business in the State of Mississippi under the laws
thereof, and ___Hartford Fire Insurance Company_____ Surety," a corporation of the State of
___Connecticut_____ authorized to do business in the State of Mississippi under the laws thereof,
_____ Mississippi Division, United Sons _____ Obligee, hereinafter referred to as
are held and firmly bound unto ___of Confederate Veterans, Inc.___
"Owner," for the use and benefit of the Owner and those claimants and others set forth herein below and described in
Sections 31-5-51 and 31-5-3, Mississippi Code of 1972, Annotated, as amended, in the amount of _____
___Ten Million, Four Hundred Eighty Eight Thousand and No/100_____ Dollars ($
___$10,488,000.00_____), lawful money of the United States, for the payment whereof Principal and
Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by
these present.

WHEREAS, Principal has by written agreement dated ___October 1___, 20 _09_, entered into a
Contract with the Owner for the following:
___Jefferson Davis Presidential Library and Museum Reconstruction___
___Biloxi, Mississippi___
___Reconstruction of the Jefferson Davis Presidential Library/Museum damaged in Hurricane Katrina___
as provided in said Contract and in accordance with the Contract Documents. All of the terms and provisions of the
above mentioned Contract, drawings, Project Manual, and addenda are by reference made a part hereof and fully
incorporated herein, and are hereinafter referred to as "the Contract." All of the terms and provisions of Sections 31-
5-51, 31-5-3, supra, Section 31-5-63 of the Mississippi Code of 1972, Annotated, as amended, and all other code
sections cited herein are also by reference made a part hereof and fully incorporated herein.

II. PERFORMANCE BOND

NOW, THEREFORE, the condition of this Performance Bond is such that if Principal shall promptly and faithfully
perform said Contract, then this obligation shall be null and void; otherwise, it shall remain in full force and effect,
subject however, to the following conditions:

Whenever the Owner has performed its obligation but the Principal has defaulted under the terms of the Contract,
or any portion thereof, and the Owner has declared the Principal to be in default, the Surety shall promptly:

    1. Remedy the default, or
    2. Complete the Contract in accordance with its terms and conditions, or
    3. Produce the completion of the Contract in accordance with its terms and conditions.

Even if there should be a succession of defaults, the Surety is responsible for completion of the Contract. The Surety
shall provide sufficient funds to pay the cost of completion of the Contract in its entirety including other costs and
damages for which the Surety may be liable there under, less the balance of the Contract price. The term "balance of
the Contract price," as used in this paragraph, shall mean the total amount payable by Owner to Principal under the
Contract and any Change Orders thereto, less the amount paid by Owner to Principal.

Contract Bond
-1-

EXHIBIT

B

Albert & Associates Architects, P.A.                 Jefferson Davis Presidential Library Reconstruction
A&AA Prt. 05414                                      Damaged in Hurricane Katrina
8 April 2009                                          Biloxi, Mississippi

### III. LABOR AND MATERIAL PAYMENT BOND

NOW, THEREFORE, the condition of this Labor and Material Payment Bond is such that if Principal shall promptly make payments to all persons supplying labor or material used in the prosecution of the work under said Contract, then this obligation shall be null and void; otherwise, it shall remain in full force and effect; however, the Owner shall not be liable for the payment of any costs or expenses of any suit described in Subsection (2) of Section 31-5-51, *supra.*

### IV. BOND FOR PAYMENT OF TAXES AND OTHER ASSESSMENTS

NOW THEREFORE, the condition of this Bond for Payment of Taxes and Other Assessments is such that if Principal shall promptly make payment of all taxes, licenses, assignments, contributions, damages, penalties, and interest thereon, when and as the same may lawfully be due the State of Mississippi, or any County, Municipality, Board, Department, Commission, or political subdivision thereof, by reason of and directly connected with the performance of said Contract or any part thereof as provided by Sections 27-65-1, 27-65-21, 27-67-1, and 31-5-3, Mississippi Code 1972, Annotated, or any other applicable statute or other authority, then this obligation shall be null and void; otherwise, it shall remain in full force and effect.

### V. GENERAL CONDITIONS

The following conditions apply to all three (3) of the above-mentioned Bonds:

1. The Performance Bond is for an amount equal to the full amount of said Contract.
2. The Labor and Material Payment Bond is for an amount equal to the full amount of said Contract.
3. If any changes are made in the work, or any extensions of time are granted, or any increases in the total dollar amount of the Contract are made, such changes, extensions, increases, or other forbearance on the part of either the Owner or the Principal will not, in any way, release the Principal and Surety, or either of them, from their liability hereunder, or any portion thereof, notice to the Surety of any such change, extension, increase, or forbearance being expressly waived.
4. These Bonds are governed by and shall be construed in accordance with Mississippi law. Any inconsistency with these Bonds and any provision of Mississippi law shall be remedied by deleting the inconsistent portion of these Bonds and leaving the remaining consistent portions in full force and effect.

Contract Bond
-2-

Albert & Associated Architects, P.A.
A&AA PN: 05414
9 April 2009

Jefferson Davis Presidential Library Reconstruction
Damaged in Hurricane Katrina
Biloxi, Mississippi

Signed and sealed this ___1st___ day of ___October___, 20__09__

SURETY    Hartford Fire Insurance Company

By: _____(Signature)_____
        (Signature)

Billie Jo Sanders, Attorney-in-Fact
_____(Name and Title) (typed)_____

2601 Bell Road
_____(Address)_____

Montgomery, AL  3611 (334)244-0004
_____(City/State/Zip/Phone)_____


J. C. Duke & Associates General Contractors, Inc.
PRINCIPAL (typed)

BY: _____(Signature)_____
        (Signature)

James C. Duke, President
_____(Name and Title) (typed)_____

1716 Industrial Park Drive
_____(Address)_____

Mobile, Alabama  36693    (251-661-4888)
_____(City/State/Zip/Phone)_____


COUNTERSIGNED:

Trina Cobb
_____

MISSISSIPPI RESIDENT AGENT
(typed and with embossed seal on bond and p/a)

_____(Signature)_____
        (Signature)

Trina Cobb, Attorney-In-Fact
_____(Name and Title) (typed)_____

111 East Capitol St., Suite 600
_____(Address)_____

Jackson, Mississippi  3920 (601)960-8200
_____(City/State/Zip/Phone)_____


END OF SECTION


Contract Bond
-3-

# POWER OF ATTORNEY

Direct Inquiries/Claims to:
**THE HARTFORD**
BOND, T-4
P.O. BOX 2103, 690 ASYLUM AVENUE
HARTFORD, CONNECTICUT 06115
call: 888-266-3488 or fax: 860-757-5835

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

Agency Code: 21-238271

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint, *up to the amount of unlimited:*

**Thomas J. Gentile, Paul B. Scott, Jr., Renee Ellis, Billie Jo Sanders, David J. Durden**

of

**Montgomery, AL**

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ☒, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on January 22, 2004 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.

Paul A. Bergenholtz, Assistant Secretary

M. Ross Fisher, Assistant Vice President

STATE OF CONNECTICUT } ss. Hartford
COUNTY OF HARTFORD }

On this 1st day of February, 2004, before me personally came M. Ross Fisher, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hartford, State of Connecticut; that he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

Scott E. Paseka
Notary Public
My Commission Expires October 31, 2007

CERTIFICATE

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of **October 1, 2009**. Signed and sealed at the City of Hartford.

Gary W. Stumper, Assistant Vice President

# POWER OF ATTORNEY

Direct Inquiries/Claims to:
**THE HARTFORD**
BOND, T-4
P.O. BOX 2103, 690 ASYLUM AVENUE
HARTFORD, CONNECTICUT 06115
call: 888-266-3488 or fax: 860-757-5835
Agency Code: 43-239145

KNOW ALL PERSONS BY THESE PRESENTS THAT:

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint,
up to the amount of unlimited:

S. Lyle Bates, Jr., Jerry G. Veazey, Jr., Jim A. Armstrong, Robert L. Elliott, Jerry Eugene Horner, Jr., Jason J. Young,
Trine Cobb, Linda D. Whitington, Peggy L. Jackson, Thomas Brent Tyler, Brody Eric Buckley, Angela Bullis
of

*Jackson, MS*

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as
delineated above by ⊠, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the
nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and
executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on January 22, 2004 the Companies
have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant
Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are
and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Paul A. Bergenholtz, Assistant Secretary

M. Ross Fisher, Assistant Vice President

STATE OF CONNECTICUT
} ss. Hartford
COUNTY OF HARTFORD

On this 3rd day of March, 2008, before me personally came M. Ross Fisher, to me known, who being by me duly sworn, did depose and
say; that he resides in the County of Hartford, State of Connecticut; that he is the Assistant Vice President of the Companies, the corporations
described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said
instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his
name thereto by like authority.



Scott E. Paseka
Notary Public
My Commission Expires October 31, 2012

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct
copy of the Power of Attorney executed by said Companies, which is still in full force effective as of **October 1, 2009**.
Signed and sealed at the City of Hartford.



Gary W. Stumper, Assistant Vice President

**BRADLEY ARANT
BOULT CUMMINGS**

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1482
bpurdy@babc.com

August 31, 2012

**VIA E-MAIL**
tselden@starneslaw.com
**AND U.S. MAIL**
Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
Post Office Box 598512
Birmingham, AL 35259-8512

|       |                 |   |                                               |
|-------|-----------------|---|-----------------------------------------------|
| RE:   | SURETY          | : | Hartford Fire Insurance Company               |
|       | OWNER/OBLIGEE   | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
|       | PRINCIPAL       | : | J.C. Duke & Associates General Contractors, Inc. |
|       | PROJECT         | : | Jefferson Davis Presidential Library and Museum Reconstruction |

SUBJECT: Default of J.C. Duke & Associates, Inc.

Dear Tom:

As we have discussed, I am privileged to serve as counsel in the referenced matter for the Mississippi Division, United Sons of Confederate Veterans, Inc. ("MDUSCV"), the obligee on the performance and payment bond issued by Hartford Fire Insurance Company ("Hartford"), as surety, for and on behalf of J.C. Duke & Associates General Contractors, Inc. ("Duke"), for the Jefferson Davis Presidential Library and Museum Reconstruction ("JDPL Project"). This refers to our telephone conversations and voice mail exchanges regarding the referenced matter.

As I think Hartford is aware, Duke last worked on the JDPL Project on August 10, 2012. On August 17, 2012, Duke sent a letter to MDUSCV advising that Duke "has suspended all services and payments related to completion, close-out, and warranty activities on these projects", including the JDPL Project. A copy of this letter is enclosed as Exhibit "A".

MDUSCV considers Duke's abandonment of the JDPL Project and Duke's acknowledgments in its letter of August 17, 2012, to constitute an admission of default by Duke under its contract with MDUSCV bonded by Hartford.

**EXHIBIT C**

DOCUMENT NUMBER: 303579

BIRMINGHAM • CHARLOTTE • HUNTSVILLE • JACKSON • MONTGOMERY • NASHVILLE • WASHINGTON DC

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
August 31, 2012
Page 2

As you can see from the enclosed letter, Duke blames Hartford for this default. MDUSCV is not in position to judge the validity of issues in dispute between Hartford and Duke. MDUSCV did not desire nor did it precipitate Duke's default. All MDUSCV knows is that, for whatever cause or reason, Duke acknowledges its default, no work has transpired since Duke abandoned the JDPL Project, and the JDPL Project and MDUSCV are incurring serious damages as a result.

It has been MDUSCV's belief that the most expeditious and economical way to complete the JDPL Project is with the resumption of work under the supervision of Duke's superintendent Jimmie Tucker and with Duke's subcontractors who know what is left to be done and should be able to finish the JDPL Project in 30-45 days. MDUSCV has expressed that belief to Hartford, and MDUSCV understands that Hartford has been working toward that objective.

However, it has now been three weeks since any work has been performed and the JDPL Project cannot continue to suffer from inactivity. In that regard, please see the e-mail, attached as Exhibit "B", from MDUSCV outlining damages from the recent storm which MDUSCV believes could have been substantially avoided if work had proceeded to completion. MDUSCV has no way of knowing whether Hartford or Duke is primarily responsible for the apparent impasse and resulting delays; all MDUSCV knows is, thus far, no work on the JDPL Project has resumed since Duke walked off the job on August 10, 2012.

MDUSCV calls upon Hartford to rectify Duke's default as promptly as possible. It is up to Hartford to determine whether this is best done through Duke or by others or some combination. The window of opportunity is in jeopardy for bringing the JDPL Project to completion before the long-planned fund raiser set for November 8. See Exhibit "C". If the facility is still incomplete then, the adverse consequences to the finances and credibility of MDUSCV will be devastating.

One way or the other, Hartford needs to get the remaining work on a sensible and effective path for completion as soon as possible, with or without Duke.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy
Attorney for Mississippi Division, United Sons
of Confederate Veterans, Inc.

WRP/kmh
Enclosures



# J. C. Duke & Associates, Inc.

1716 Industrial Park Dr.
Mobile, AL 36693
Phone: 251-661-4888
Fax: 251-661-1181

August 17, 2012

Mississippi Division
United Sons of Confederate Veterans
2244 Beach Blvd
Biloxi, MS 39531

Subject:     Project Completion Status Update and Path Forward
             Open Bonded Projects for J. C. Duke & Associates General Contractors, Inc.

Reference:   Hartford Fire Insurance Company Actions on August 16, 2012
             Jefferson Davis Presidential Library Reconstruction

Dear Sir:

As previously conveyed, on February 3, 2012, J. C. Duke & Associates General
Contractors, Inc. ("JCD") filed for reorganization in accordance with Chapter 11 of the Federal
Bankruptcy statute. On March 20, 2012 the Courts issued an order approving a Bonded
Receivables Cash Collateral Agreement which allowed JCD to complete JCD's contractual
obligations to its clients, vendors and subcontractors.

JCD's surety company, Hartford Fire Insurance Company ("Hartford"), has objected to
the court extending JCD's Cash Collateral Agreement. This grievous action effectively
redirected all of JCD's cash receivables on bonded projects from JCD to Hartford thereby
making it impossible for JCD to continue paying for activities related to completing bonded
projects.

Hartford has sent a notification to all bonded project Owners directing them to pay all
remaining contract funds, including retainage direct to Hartford. Accordingly, JCD has
suspended all services and payments related to completion, close-out and warranty activities on
these projects.

JCD and its employees have worked diligently to complete these projects and it is
regrettable that Hartford has taken such a ruthless path. Hartford's actions will undoubtedly
prevent the timely completion of the projects and prompt payments to vendors and
subcontractors.

Page 1 of 2

EXHIBIT

A

Please contact Hartford for any remaining project execution, warranty or payment issues. Hartford's contact information is as follows:

Hartford Fire Insurance Company - Bond Claim Department
One Hartford Plaza, T-4 101
Hartford, CT 06115

Attention: Gary Judd  Ph: (860) 547-8239,  Fax:(860) 221-3825
E-mail Gary.Judd@thehartford.com

Sincerely;

James C. Duke
President

**From:** Larry Albert [mailto:larry@albertassociates.com]
**Sent:** Thursday, August 30, 2012 3:20 PM
**To:** gary.judd@theharford.com
**Cc:** 'Chris Robinson'; ahelms@jcduke.com; 'James Duke'; 'Purdy, Bill'; Don Barrett; rforte@beauvoir.org; bhayesdavis@beauvoir.org
**Subject:** FW: Beauvior and Library Update

Gary:

Please see the Jefferson Davis Presidential Library Building envelope failures below.

Larry

<image001.gif>
<image002.jpg>
Larry A. Albert, AIA
514 Main Street
Hattiesburg, MS 39401
Phone (601) 544-1970
Fax (601) 544-4714
www.albertassociates.com
mailto:yourname@albertassociates.com

**Confidentiality Notice:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message

**From:** Carol Hayes-Davis [mailto:bhayesdavis@att.net]
**Sent:** Thursday, August 30, 2012 2:50 PM
**To:** Rick Forte; Larry Albert; Don Barrett
**Subject:** Beauvior and Library Update

Please see the details the current status of the grounds buildings and library below.. The major issues with the Library are currently being addressed. Service Pro has been called to clean up the the water. We are are using trash barrels and containers to collect the water.
I will update you further when they have completed the clean up.
I called Socia Brothers roofing and they did not answer. I will continue to call them to get them here to repair the roof.
Please call if you need addtional information.


Beauvoir Grounds and Library Update
August 30 2:00

I have toured the grounds, checked all the houses and the Library. Here's the current status:

EXHIBIT

B

Grounds:  Currently we have 6-8 large tree limbs down and trees uprooted. The closest tree was next to the Hayes Cottage. No damage to any buildings due to trees or limbs. Sinkhole has developed on road to barn 4 feet x 6 feet due to storm runoff from the Biloxi water mains.

Trailers: No damage or leaking.

Hayes Cottage:  Minor leakage through doorway.

Library: Major leaks throughout the Library.

1st floor

Beauvoir Room:  Large ceiling leak, water in power room from ceiling leak,

Reception Area Outside Beauvoir Room:  Major ceiling leak

Entry Area: Water coming from upper gallery and through doors

Administration Area:  3 offices leaking through walls and windows, employee door leaking

Base of Stairway:  Water at base of stairs, leaks in windows and ceiling

2nd Floor

Entry Way:  Leaks in windows and ceiling

Board Room:  Doors have no latches were open, floor covered with water

Travelling Gallery:  Water coming through walls, water coming in through double doors

Concourse:  Water through the base of one column

Large Gallery:  Water leak in ceiling dripping on ventilation system spattering along floor

Small Gallery:  Water leak in ceiling dripping on ventilation sysem  spattering along floor

Library Room:  Leaks from ceiling and floor and windows, water in elevator lobby and an exit door to the gallery

Vault:  Access hatch to the roof open, water throughout curator's office, collection area and vault

Bertram

## Hennington, Kathy

| | |
|---|---|
| **From:** | Carol Hayes-Davis [bhayesdavis@att.net] |
| **Sent:** | Friday, August 31, 2012 1:47 PM |
| **To:** | Larry Albert; Purdy, Bill |
| **Subject:** | Re: Beauvior and Library Update |

Bill and Larry,

The Festival of trees event is set for Nov 8th from 6-9 pm. This event will feature 100 decorated tress that will be auctioned for the benefit of Beauvoir. We are planning to have the event in the Library and also the Governor's wife is our honorary Chair. This event will raise a significant amount for Beauvoir operating funds. Please advise if i can provide any additional information.

Bertram

**EXHIBIT**

**C**

**BRADLEY ARANT**
**BOULT CUMMINGS**

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1462
bpurdy@babc.com

September 5, 2012

VIA E-MAIL
tselden@starneslaw.com
AND U.S. MAIL
Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
Post Office Box 598512
Birmingham, AL 35259-8512

|  |  |  |  |
|---|---|---|---|
| RE: | SURETY | : | Hartford Fire Insurance Company |
|  | OWNER/OBLIGEE : |  | Mississippi Division, United Sons of Confederate Veterans, Inc. |
|  | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
|  | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |

SUBJECT: Safeguarding Beauvoir JPDL

Dear Tom:

Attached is a message received last evening from Larry Albert, the Project Architect.

As you can see, the Owner is in a terrible bind. The Architect can't get subcontractors to respond to requests to survey damage and take corrective action because (1) the subcontractors have no contract with the Owner and will not act without direction/permission from J.C. Duke and/or (2) the subcontractors have not been paid.

The Owner needs Hartford to get involved immediately to rectify this situation. Duke's subcontractors must be organized to assess storm damage from Hurricane Isaac and motivated to take action as appropriate to prevent further harm to the property.

At a minimum, the roof needs to be fully and properly repaired. The Owner should not have to be forced to arrange for this; that is why the Owner has a bond. Besides, the Owner does not want to undertake any action that could adversely affect or perhaps even void the roof warranty.

**EXHIBIT**
**D**

DOCUMENT NUMBER: 303579

BIRMINGHAM • CHARLOTTE • HUNTSVILLE • JACKSON • MONTGOMERY • NASHVILLE • WASHINGTON DC

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
September 5, 2012
Page 2

Of course, the sooner the subcontractors complete their work, the less risk there will be of further problems. Liquidated damages continue to accumulate at $500 per day. Things will have to happen fast to protect the November fund raising event.

Please advise right away what Hartford intends to do so I can advise the Architect and Owner representatives.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy
Attorney for Mississippi Division, United Sons
of Confederate Veterans, Inc.

WRP/kmh
Enclosure



**Mississippi Division, United Sons of Confederate Veterans, Inc.**
2244 Beach Boulevard
Biloxi, Mississippi 39351

September 10, 2012

Mr. James C. Duke, President
J.C. Duke & Associates General Contractors, Inc.
1716 Industrial Park Drive
Mobile, Alabama 36693

> RE:   Contract dated October 1, 2009, by and between Mississippi Division, United Sons of Confederate Veterans, Inc., as Owner, and J.C. Duke & Associates General Contractors, Inc., as Contractor, for Jefferson Davis Presidential Library and Museum Reconstruction, Beauvoir, Biloxi, Mississippi ("Project")

> SUBJECT: Declaration and Notice of Default Termination

Dear Mr. Duke:

This letter is being written by the Mississippi Division, United Sons of Confederate Veterans, Inc. ("Owner") to you as President and authorized representative of J.C. Duke & Associates General Contractors, Inc. ("Contractor"), concerning the referenced Standard Form of Agreement Between Owner and Contractor, AIA Document A101-2007, dated October 1, 2009 ("Agreement") for Jefferson Davis Presidential Library and Museum Reconstruction ("Project").

Pursuant to the Order entered August 23, 2012, in the U.S. Bankruptcy Court, S.D. Ala., Southern Div., In Re: J.C. Duke & Associates General Contractors, Inc., Debtor, Case No. 12-00391 and in accordance with the termination provisions of the referenced Agreement for the Project, the Owner declares the Contractor to be in material breach and default of the Agreement and gives notice of Termination by the Owner for Cause in accordance with the terms and conditions of the Agreement.

The Owner's termination of the Contractor for default is based upon multiple reasons to numerous to mention, including but not limited to:

1.     Contractor's abandonment of the Project as of August 10, 2012;



**EXHIBIT**

**E**

Mr. James C. Duke, President
J.C. Duke & Associates General Contractors, Inc.
September 10, 2012
Page 2

---

2. Contractor's letter to Owner, dated August 17, 2012, acknowledging the Contractor's unauthorized suspension of work, the impossibility of the Contractor's continuing to pay for activities related to completing the Project, and the Contractor's inability to timely complete the Project, all of which are material breaches of the Agreement and, individually and collectively, constitute grounds for default termination;

3. Contractor's failure to prosecute the Project;

4. Contractor's material failure to perform in accordance with the Agreement and Contract Documents.

The Owner shall exercise its rights as provided by the Agreement and also pursuant to the Bond issued to the Owner, as obligee, by Hartford Fire Insurance Company, as surety, for and on behalf of the Contractor, as principal, for the subject Project.

Sincerely,

Richard V. Forte, Sr.
Chairman of the Board of Directors

cc:    Hartford Fire Insurance Company

**Hennington, Kathy**

| | |
|---|---|
| From: | Purdy, Bill |
| Sent: | Wednesday, September 26, 2012 4:05 PM |
| To: | 'Tom Selden' |
| Cc: | Drake Blackmon |
| Subject: | RE: Hartford/Beauvoir |
| Attachments: | Document1.pdf |

Here are "red alert" items in order of priority:


1.      Waterproof the building.

2.      Address issues in the Architect's email attached

3.      Focus on completing the ground floor

a.      Lobby/Gift Shop/Rest Rooms

b.      Administrative Areas

c.      Beauvoir Room

d.      Other

4.      Second floor

a.      Central Stairway/Lobby

b.      Vault

c.      Two Galleries

1.      Boardroom



From: Tom Selden [mailto:TSelden@starneslaw.com]
Sent: Tuesday, September 25, 2012 2:43 PM
To: Purdy, Bill
Cc: Drake Blackmon
Subject: RE: Hartford/Beauvoir


Bill,

1

EXHIBIT
F

We have sent a revised Agreement to Hartford and are awaiting their input. Hope to have something to you soon. In the meantime, could you get us a list of what are "red alert," priority items that your client wants addressed first?


Thanks,


Tom


<file:///C:\Program%20Files\Exclaimer\www.starneslaw.com>
Thomas L Selden - Attorney
100 Brookwood Place, 7th Floor, Birmingham, AL 35209 P.O. Box 598512, Birmingham, AL 35259-8512
(205) 868-6021 - Fax: (205) 868-6099 - www.starneslaw.com <http://www.starneslaw.com/>


From: Purdy, Bill [mailto:bpurdy@babc.com]
Sent: Tuesday, September 25, 2012 10:04 AM
To: Tom Selden
Cc: 'DBlackman@starneslaw.com'
Subject: Hartford/Beauvoir

Can you please advise me of the status and current plan of action?


William R. Purdy

Bradley Arant Boult Cummings LLP
Suite 400, One Jackson Place
188 E. Capitol Street

Jackson, MS 39201


Post Office Box 1789
Jackson, MS 39215-1789

(601) 592-9962 (direct)
(601) 592-1462 (direct)
* bpurdy@babc.com <mailto:bpurdy@bradleyarant.com>


NOTICE: While this firm does not render tax advice, we nevertheless advise the following pursuant to IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we

2

inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone (205) 868-6000 or by electronic mail, and delete this message and all copies and backups thereof. Thank you.

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

Bill:

No. 1 stop the fire sprinkler pipe in the penthouse from leaking water constantly. This is a constant source of water in the wrong place

No. 2. The carpet that is stored in Ed Agostinelli's warehouse with Gleem's Carpet One for the building is a Shaw Opulent EW24 that was a long lead item for the building. Glen has gotten his credit shut off because of not paying for this carpet. He has had multiple conversations with me and Rick Forte. I forwarded you his e mails he sent to me today. He had installed the carpet in the multipurpose room. He had the wood flooring installed in the Board Room and both of the Galleries. He also installed all of the Porcelain Ceramic Tile flooring. This subcontractor was doing a good job and now his company is suffering. He keeps threatening to send the carpet back which will cost him more for shipping and we will not have the specified carpet for the project. Of course we can change our carpet choice although Shaw Manufacturing Representatives gave us the advice to use this carpet for this use. I think this man deserves to be treated fair. His cell phone number is 251-422-5105.

No. 3 Get the Kone' elevators turned over. The last conversation I had Heath Phillips 251-583-2786 was they needed one more telephone line. The elevators usually cause us the most delay at the end of projects we have finalized in the last few years. Of course there is coordination between the elevator, fire alarm, emergency power and telephone. Coordinating all of these people to get everything working is difficult to schedule. It would be great to get the elevators working and accepted by Beauvoir so we will know they will not cause delay of occupancy with great frustration at the end of the project.

No. 4 Another long lead item will be if the aluminum doors to the Board Room balcony have to be replaced. I would suggest having 3d glass get these doors fixed or order the replacements as a high priority.

No. 5 The mechanical equipment roof penetrations and condensate lines are a main source of water intrusion. The electrical systems utilize some of these same penetrations. Rick Forte got the condensate line fixed at the Board Room although I still believe there may be a problem at the Multipurpose room. Please see Chris Robinson's Isaac report. The mechanical unit curbs are to low so the roof will not pass the manufacturer's inspection.

No .6 Both of the roof hatches are failing ( Saucier Bros. said they were ordering parts to correct these problems although it may require a new hatch and not just repairs ) along with missing roof flashing that needs to be completed. There are wall locations without mortar or caulk causing leaks also.

No. 7The skylights are not correctly installed as stated in Chris Robinson's Report.

All of the water problems need to be corrected and then the specified water test can be started that we have requested for nearly a year at this point.

Of course a good General Contractor would proceed to execute all of these items at once which puzzles me about the priority list?

I would suggest forwarding Chris Robinson's report which identifies most of the ongoing water problems.

Larry

**ALBERT & ASSOCIATES ARCHITECTS**

Larry A. Albert, AIA
514 Main Street
Hattiesburg, MS 39401
Phone (601) 544-1970
Fax (601) 544-4714
www.albertassociates.com
mailto:yourname@albertassociates.com

**Confidentiality Notice:** This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message

**BRADLEY ARANT BOULT CUMMINGS**

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1462
bpurdy@babc.com

September 26, 2012

**VIA E-MAIL**
DBlackmon@starneslaw.com
**AND U.S. MAIL**
W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

| | | | |
|---|---|---|---|
| RE: | SURETY | : | Hartford Fire Insurance Company |
| | OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
| | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
| | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |

Dear Mr. Blackmon:

This is the response on behalf of the Mississippi Division, United Sons of Confederate Veterans, Inc. ("Obligee") to your letter written this date on behalf of the Hartford Fire Insurance Company ("Hartford").

Paragraph 1. Please refer to the letter I had previously sent to Tom Selden earlier today regarding payments as provided by the Bond. Another copy of this letter is attached for your convenient reference.

As you will see, the Obligee proposes to follow the Bond by making payments to Hartford of amounts "payable by the Owner to Principal under the Contract." Through your letter, Hartford demands payment of money not owed by the Obligee to the Principal under the Contract and payment of amounts sooner than they are payable under the Contract. The conditions Hartford seek to impose are contrary to Bond language and, based upon our September 18, 2012 meeting which you attended, are well known by Hartford to be objectionable to the Obligee. If, as I understand your letter, Hartford is willing to undertake its Bond obligations only subject to these conditions contrary to the Bond, then Hartford is in breach of the Bond and acts in bad faith.

Paragraph 2. The Obligee believes that all work should have been and still can be accomplished by the November 8, 2012 grand opening. It is Hartford's responsibility to complete the work "promptly" pursuant to the Bond. Hartford hasn't even started yet.

**EXHIBIT "G"**

BIRMINGHAM • CHARLOTTE • HUNTSVILLE • JACKSON • MONTGOMERY • NASHVILLE • WASHINGTON DC

W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
September 26, 2012
Page 2

---

Paragraph 3. This is what the Bond already requires.

Paragraph 4. Hartford knows the Obligee believes that there are unremedied defects and deficiencies in the existing work. These have been called to the Principal's attention and some have been uncovered by Hurricane Issac. Several of such items, like leaking windows, were specifically pointed out to Hartford during the meeting at Beauvoir on September 18, 2012. Thus, the representation of "no defects" which Hartford insists that the Obligee make is known by Hartford to be false. See paragraph 1.

Paragraph 5. I am not aware of any materials stored off-site. In any event, where is this representation required by the Bond?

Paragraph 6. The Payment Bond is in force according to its terms. The Obligee is not required to agree to further embellishments beyond the terms of the Bond.

Paragraph 7. This is unnecessary. We are already communicating.

Paragraph 8. Since the Obligee is not agreeing to do anything beyond what the Bond requires, this statement is inapplicable.

Paragraph 9. The Obligee has referred and will continue to refer all payment bond claimants to Hartford.

Paragraph 10. Since no rights are being relinquished, all rights are reserved.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy

WRP/kh
Enclosure

cc:     Mississippi Division, United Sons of Confederate Veterans, Inc.



BRADLEY ARANT
BOULT CUMMINGS LLP

William R. Purdy

Direct Dial: 601/592-9062
Direct Fax: 601/592-1462
bpurdy@babc.com

September 26, 2012

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

|  |  |  |  |
|---|---|---|---|
| RE: | SURETY | : | Hartford Fire Insurance Company |
|  | OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
|  | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
|  | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |

Dear Mr. Selden:

Larry Albert, the Project Architect, has certified Duke's last Application for Payment No. 031 for period to July 19, 2012, in the amount of $82,701.84. See marked up copy of Application for Payment No. 31, attached. This results in a balance to finish of $811,701.44 of which $525,051.79 is retainage and $286,649.65 is unearned contract balance.

The Bond states that "the balance of the Contract price" means "the total amount payable by the Owner to Principal under the Contract and any Change Orders thereto, less the amount paid by the Owner to Principal." The only amount "payable to Principal under the Contract" is $82,701.84. Other amounts will become "payable to Principal under the Contract" as further work is completed. Retainage is not "payable to Principal under the Contract" until final completion and acceptance.

The Contract completion date is 550 calendar days from date of commencement, which was October 15, 2009. This established an original Contract completion date of April 18, 2011. There has been one time extension given for seventeen days which produces an extended Contract completion date of May 5, 2011.

The Contract specifies liquidated damages of $500 per calendar day. From May 5, 2011, until September 26, 2012, there have been 510 calendar days. Liquidated damages chargeable against the Principal as of September 26, 2012 are $255,000 and continue to run at $500 per day.

According to the language of the Bond, these liquidated damages constitute "costs and damages for which the Surety may be liable" under the Contract and, in any event,

EXHIBIT

G

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
September 26, 2012
Page 2

pursuant to the Contract, liquidated damages are to be subtracted from "the total amount payable by the Owner to Principal under the Contract." At Hartford's pace, it is difficult to predict what the liquidated damages might ultimately total. These damages will be subtracted at the time of final payment when Hartford's completion contractor satisfies the contractual conditions for the making of final payment.

As discussed at the meeting of September 18, 2012 held at Beauvoir, Mr. Albert is compiling a listing of additive and deductive changes. These are expected to produce a net negative number which must also be subtracted from "the total amount payable by Owner to Principal under the Contract." The Obligee contemplates making this adjustment to retainage.

In view of the foregoing, the Obligee proposes to pay Hartford the current payment due of $82,701.84 when Hartford's contractor has mobilized to the project and has commenced productive work. The Obligee will pay the remainder of the unearned contract balance of $286,649.65 upon further satisfactory completion of work by Hartford's contractor as certified by the Project Architect.

Further, as discussed in the meeting with Hartford representatives on September 18, 2012, the Obligee is inclined to assign to Hartford the proceeds of the builder's risk insurance adjustment for Hartford to negotiate with the builder's risk carrier in exchange for Hartford's agreement to repair the storm damage from Hurricane Isaac as part of its completion obligation. The currently adjusted builder's risk insurance amount is $154,397, less the $20,000 deductible, for a net payment of $134,397, subject to Hartford's further negotiation and acceptance.

By my calculation, this will provide Hartford with total funds consisting of current payment due of $82,701.84, unearned contract balance of $286,649.65, and insurance proceeds of at least $134,397, totaling $533,748.49 which, frankly, should be ample to complete the JDPL project.

Once final completion has been achieved in accordance with the Contract, the Obligee will pay the adjusted retainage amount to Hartford.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy

WRP/kh

cc:   Mississippi Division, United Sons of Confederate Veterans, Inc.

**Tarpley, Bethany**

| | |
|---|---|
| From: | Purdy, Bill |
| Sent: | Friday, September 28, 2012 1:52 PM |
| To: | Laura Lynn Morris |
| Cc: | Tom Selden; Drake Blackmon |
| Subject: | Re: Jeff Davis Project - letter confirming agreement by Hartford to takeover project |

For the fifth or maybe sixth time, the Obligee is not signing another agreement with Hartford that could be argued to alter the terms of the Bond. Hartford needs to proceed with completion of the Project as required by the Bond.

The Obligee has already explained its intentions as regards the payment process. The Obligee has already provided Hartford with a detailed listing of priority items in order of importance. The Obligee acknowledges that both the Obligee and Hartford fully reserve all their rights, not necessarily limited to the issues you have listed.

Now, will your client please get on with the work which is long past due?

Sent from Bill's iPhone

On Sep 28, 2012, at 12:28 PM, "Laura Lynn Morris" <lmorris@starneslaw.com> wrote:

> Bill,

Attached you will find the revised version of the letter delineating the takeover agreement  You'll note that paragraph one has been changed to address your interpretation that our previous drafts required payments sooner than allowed under the contract. This was not our intent nor our interpretation of the previous drafts. The revised paragraph one contains language specifying that payments will be made as the work progresses on the project. Please let us know your thoughts. Feel free to contact me if you have any questions or need any additional information.

Laura Lynn

<mime-attachment.jpg> <file:///C:/Program%20Files/Exclaimer/www.starneslaw.com>
Laura Lynn Lester - Attorney
100 Brookwood Place, 7th Floor, Birmingham, AL 35209
P.O. Box 598512, Birmingham, AL 35259-8512
(205) 868-6074 - Fax: (205) 868-6099 - www.starneslaw.com <http://www.starneslaw.com/>

NOTICE: While this firm does not render tax advice, we nevertheless advise the following pursuant to IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement, then (i) the advice should be

1

EXHIBIT
H

construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
     This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone (205) 868-6000 or by electronic mail, and delete this message and all copies and backups thereof. Thank you.

     Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

     <9-28 Draft of Takeover Agreement Letter LLL (B1485226).doc>

There has been unreasonable delay already. The Obligee has been patient beyond all reasonable limits. The Obligee reiterates its previous notices that time is running out for Hartford to honor its commitments under the Bond.

Sent from Bill's iPhone


On Sep 28, 2012, at 8:56 PM, "Laura Lynn Morris" <lmorris@starneslaw.com> wrote:

> Bill,
>
> I hope you are enjoying your Friday. In response to your e-mail, we
> are perplexed by your refusal to sign the takeover agreement. First,
> we do not agree with your assertion that the takeover agreement alters
> the terms of the bond. Furthermore, during the site meeting last week,
> you and Drake discussed that a letter agreement for the surety to take
> over the work is needed, and it was agreed that we would forward said
> agreement to you for approval so that work could proceed as soon as
> possible. We have sent three different versions of the letter to
> attempt to work with you. Your refusal to sign the agreement is
> preventing us from proceeding with completion of the project. Our
> interests are aligned with yours in that both of our goals are to
> complete the library as soon as possible, but this lack of cooperation
> is hindering the progress. We would like to set up a conference call
> early next week to discuss so that work can proceed with the project
> completion as soon as possible. I hope you have a good weekend.
>
> Thank you,
> Laura Lynn
>
> On Sep 28, 2012, at 1:53 PM, "Purdy, Bill" <bpurdy@babc.com> wrote:
>
>> For the fifth or maybe sixth time, the Obligee is not signing another agreement with
Hartford that could be argued to alter the terms of the Bond. Hartford needs to proceed with
completion of the Project as required by the Bond.
>>
>> The Obligee has already explained its intentions as regards the payment process. The
Obligee has already provided Hartford with a detailed listing of priority items in order of
importance. The Obligee acknowledges that both the Obligee and Hartford fully reserve all
their rights, not necessarily limited to the issues you have listed.
>>
>> Now, will your client please get on with the work which is long past due?
>>
>> Sent from Bill's iPhone
>>
>> On Sep 28, 2012, at 12:28 PM, "Laura Lynn Morris"
<lmorris@starneslaw.com<mailto:lmorris@starneslaw.com>> wrote:
>>
>>
>> Bill,
>>
> > Attached you will find the revised version of the letter delineating the takeover
agreement   You'll note that paragraph one has been changed to address your interpretation
that our previous drafts required payments sooner than allowed under the contract. This was
not our intent nor our interpretation of the previous drafts. The revised paragraph
contains language specifying that payments will be made as the work progresses on the

2

EXHIBIT

1

project. Please let us know your thoughts. Feel free to contact me if you have any questions or need any additional information.

>>
>> Laura Lynn
>>
>> <mime-attachment.jpg><file:///C:/Program%20Files/Exclaimer/www.starne
>> slaw.com>
>> Laura Lynn Lester - Attorney
>> 100 Brookwood Place, 7th Floor, Birmingham, AL 35209 P.O. Box 598512,
>> Birmingham, AL 35259-8512
>> (205) 868-6074 - Fax: (205) 868-6099 -
>> www.starneslaw.com<http://www.starneslaw.com/>
>>
>>
>> _____
>> NOTICE: While this firm does not render tax advice, we nevertheless advise the following pursuant to IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
>> This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone (205) 868-6000 or by electronic mail, and delete this message and all copies and backups thereof. Thank you.
>> _____
>>
>> _____
>>
>> Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.
>> <9-28 Draft of Takeover Agreement Letter LLL (B1485226).doc>
>>
>>
>>
>> Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.
>
> _____
>
> Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

3

# STARNES | DAVIS FLORIE LLP

Thomas L. Selden
Starnes Davis Florie LLP
P.O. Box 598512
Birmingham, AL 35259-8512
Phone: (205) 868-6021
Facsimile: (205) 868-6099
E-mail: tselden@starneslaw.com

October 5, 2012

Mississippi Division — United Sons of Confederate Veterans
c/o Mr. Bill Purdy
Bradley, Arant, Boult Cummings, LLP
One Jackson Place
188 E. Capitol Street, Suite 400
Jackson, MS 39201
Ph: (601) 948-8000
F:   (601) 948- 3000

RE:   Jefferson Davis Presidential Library Project
      Takeover of Project by Hartford Fire Insurance Company

Dear Bill:

This letter is to memorialize Hartford Fire Insurance Company's ("Hartford") agreement to takeover the Jefferson Davis Presidential Library Project (the "Project") in Biloxi, Mississippi. Hartford's agreement to takeover the project, pursuant to the Sons of Confederate Veterans' claim on the performance bond issued by Hartford in favor of J.C. Duke, was triggered by the Sons of Confederate Veterans' declaration of default of J.C. Duke & Associates General Contractors ("J.C. Duke") and the termination of its contract with J.C. Duke; and Sons of Confederate Veterans' demand on Hartford, as surety, to take over and complete all work that remains to be performed on the Project pursuant to the plans, specifications, and related contract documents (collectively, the "Contract").

1)   Hartford is willing to undertake to complete all work pursuant to the aforementioned performance bond issued in favor of Sons of Confederate Veterans, which is hereby incorporated herein by reference, required by the Project plans and specifications, provided that the entire remaining unpaid contract balance and any additional amounts which may be added to the contract due to extra work, insurance proceeds or change orders, is paid to Hartford as set forth in the contract documents Sons of Confederate Veterans and Hartford agree that the remaining contract balance is $811,701.44 with a current amount earned of $82,701.84 and a balance to earn of $286,649.65. Payment shall be made to Hartford pursuant to payment applications in

{B1485226}

100 Brookwood Place  |  Seventh Floor  |  P.O. Box 598512  |  Birmingham, Alabama 35259-8512  |  205-868-6000

RSA Battle House Tower  |  11 North Water Street  |  P.O. Box 1548  |  Mobile, Alabama 36633-1548  |  251-433-6049       starneslaw.com

EXHIBIT

J

October 5, 2012
Page -2-

accordance with work that progresses on the Project, which shall be subject to review and approval by the project Architect as provided in the Contract.

2) Sons of Confederate Veterans acknowledges that Hartford is not a contractor and that Hartford will agree to complete or arrange for completion of the work in accordance with the Project plans and specifications. It is understood and agreed by Sons of Confederate Veterans that Hartford may employ or engage consultants, independent contractors or construction managers of its choosing, and proceed to complete the work in any manner which Hartford, in its sole discretion, deems appropriate and expeditious. Sons of Confederate Veterans agrees to cooperate and assist Hartford and its consultants, independent contractors, or construction managers as set forth herein.

3) Hartford agrees to perform with reasonable speed all remaining work required by the original contract with J.C. Duke, including all warranties and guaranties required to be provided by J.C. Duke, in accordance with the terms and conditions of the Original Contract except as to time for completion of the Project, subject to the penal sum of the Performance Bond which is limited to and shall not exceed the penal sum of $10,488,000.

4) Sons of Confederate Veterans acknowledges, agrees, and represents to Hartford that it has knowledge of certain defects and deficiencies with the work on the Project. Hartford and Sons of Confederate Veterans reserve all rights and defenses as to the issue of whether said defects and deficiencies are the cause of J.C. Duke and/or its subcontractors, or any other cause.

5) Sons of Confederate Veterans recognizes that Hartford may be liable to unpaid suppliers and subcontractors of J.C. DUKE. Sons of Confederate Veterans agrees to make no representations or promises of payment to those suppliers and subcontractors and refer all inquiries to Hartford.

6) Hartford agrees to obtain authorization and permission, if necessary, from the United States Bankruptcy Court for the Southern District of Alabama. In re: J. C. Duke & Associates General Contractors, Inc., Case No.: 12-00391-WSS-11, to negotiate a certain check from the Mississippi Windstorm Underwriting Association under a builder's risk insurance policy, representing payment for storm damage caused by Hurricane Isaac.

{B1485226}

2

October 5, 2012
Page -3-

7)    **Mutual Reservation of Rights Except as Expressly Set Forth Herein**

SONS OF CONFEDERATE VETERANS and HARTFORD reserve all rights, claims, and defenses which in any manner relate, refer or pertain to all issues concerning J.C. DUKE's performance and work prior to termination of the original contract, and Hartford's agreement to takeover the work pursuant to Sons of Confederate Veterans claim on the performance bond, including, but not limited to, all issues relating to (1) the SONS OF CONFEDERATE VETERANS declaration of default and termination of the contract with J.C. Duke, (2) the quality and quantity of work performed by J.C. DUKE prior to termination; (3) amounts paid to J.C. DUKE by SONS OF CONFEDERATE VETERANS prior to termination; (4) change orders and additional compensation due J.C. DUKE with respect to its performance prior to termination; (5) time extensions as provided by the original contract, (6) any alleged assessment of liquidated damages, (7) all other issues relating to J.C. DUKE's performance, 8) amounts to be paid to Hartford for its takeover of the Project, and 9) HARTFORD's liability under the payment and performance bonds, including issues relating to limitations of liability regarding the penal sum of the payment and performance bonds and Hartford's performance of the takeover work on the Project.

October 5, 2012
Page -4-

Date:_____                    MISSISSIPPI DIVISION – UNITED
SONS                                      OF CONFEDERATE VETERANS

                                  BY:_____

                                  Its_____


Date:_____                    HARTFORD FIRE INSURANCE
COMPANY

      BY:_____

                                  Its_____

**BRADLEY ARANT
BOULT CUMMINGS**

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1462
bpurdy@babc.com

October 9, 2012

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

| | RE: SURETY | : | Hartford Fire Insurance Company |
|---|---|---|---|
| | OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
| | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
| | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |

Dear Mr. Selden:

This responds to yet another "takeover agreement" dated October 5, 2012, which Hartford Fire Insurance Company ("Hartford") has once again presented to the Mississippi Division, United Sons of Confederate Veterans, Inc. ("Obligee"), concerning the Bond issued by Hartford for and on behalf of J.C. Duke & Associates General Contractor, Inc. ("J.C. Duke") with respect to the Jefferson Davis Presidential Library Project ("JDPL Project").

As I had advised you last Thursday evening, I was out of town from last Friday through Monday (yesterday), and I had a hearing this morning. I was just now able to review the document you sent dated Friday, October 5, 2012.

Hartford has been advised repeatedly that the Obligee disagrees that there is any requirement anywhere stated in the Bond for a separate "takeover agreement" which Hartford keeps insisting upon. Hartford has been asked repeatedly to point out its legal justification for such an agreement subsequent to and separate from the Bond, but to date Hartford has simply demanded the

**EXHIBIT**
**K**

BIRMINGHAM • CHARLOTTE • HUNTSVILLE • JACKSON • MONTGOMERY • NASHVILLE • WASHINGTON DC

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
October 9, 2012
Page 2

Obligee sign one "agreement" after another, without providing any legal basis for its demands. Further, as with all the others, the terms of the document you forwarded on October 5, 2012 are unacceptable.

As you well know, the Obligee disagrees with your first paragraph wherein Hartford contends that its duties under the Bond were not "triggered" until the Obligee's formal declaration of default. The Obligee thought such a formal declaration was unnecessary under the circumstances, and such declaration was issued by the Obligee only because Hartford specifically requested it. It is the Obligee's position that Hartford had been dealing with J.C. Duke for months about completing the work bonded by Hartford, Hartford knew J.C. Duke's situation far better than did the Obligee, Hartford prevented J.C. Duke from proceeding with the JDPL Project, and Hartford was well aware that J.C. Duke had abandoned the JDPL Project in August and voluntarily declared itself in default, all of which obviated any need for a formal declaration by the Obligee.

Further, in paragraph 1, Hartford backtracks on its previous agreement that the Obligee would pay to Hartford only to "amounts payable to Principal under the Contract" pursuant to the Bond, in accordance with my letter of September 26, 2012. In your proposed agreement, Hartford reverts to its main goal from the beginning to grab all the money. Why did you even bother with submitting such an insulting suggestion that you know is completely uncalled for by the Bond and totally unacceptable to the Obligee?

In numbered paragraph 3, the Obligee does not agree with your language "except as to time for completion of the Project" as this appears to absolve Hartford from liability for late completion of the JDPL Project. Hartford is subject to the same time for completion of the JDPL Project as stated in J.C. Duke's contract, and Hartford may not alter the contract terms by a subsequent "takeover agreement". This is exactly my point about why takeover agreements are inappropriate when there is already a Bond in place with contrary terms. The Obligee is not about to waive contract completion requirements through an ambiguous clause which Hartford inserted into the middle of a long sentence of an unnecessary takeover agreement.

The Obligee disagrees with the recitation of reserved rights in paragraph 7. All rights under the Bond or as otherwise provided by law are reserved by all parties as to all issues. Nothing but confusion and prejudice to the Obligee can arise by listing only the reserved rights Hartford wants and leaving out those of the Obligee.

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
October 9, 2012
Page 3

I have redrafted your "agreement" by converting it into a letter of intention. See redlined and clean versions attached. If Hartford sends this letter to the Obligee as revised, the Obligee will advise Hartford that the Obligee has no objection to Hartford's stated intentions. What the Obligee does object to is Hartford's continued delay in commencing completion of the JDPL Project. Notwithstanding the Obligee's lack of objection to Hartford's intentions to be stated in the attached revised letter of intention, further delay may force the Obligee to act unilaterally to get the JDPL Project completed.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy
Attorney for Mississippi Division, United
Sons of Confederate Veterans, Inc.

WRP/kh
Enclosures

cc:    Mississippi Division, United Sons of Confederate Veterans, Inc.

RE:   Jefferson Davis Presidential Library Project
      Conditions for Take ~~o~~Over of Project by Hartford Fire Insurance
      Company

Dear Bill:

This letter is to memorialize ~~that~~ Hartford Fire Insurance Company~~'s~~ ("Hartford") ~~shall~~ agreement to ~~take~~ over ~~and complete~~ the Jefferson Davis Presidential Library Project (the "Project") in Biloxi, Mississippi. ~~Hartford's agreement to takeover the project,~~ pursuant to the claim by the Mississippi Division, United Sons of Confederate Veterans~~',~~ Inc. ("Sons of Confederate Veterans") ~~claim~~ on the performance bond ("Bond") issued by Hartford in favor of J.C. Duke & Associates General Contractors, Inc. ("J.C. Duke")~~, was triggered by the Sons of Confederate Veterans' declaration of default of J.C. Duke & Associates General Contractors ("J.C. Duke") and the termination of its contract with J.C. Duke; and Sons of Confederate Veterans' demand on Hartford, as surety, to take over and complete all work that remains to be performed on the Project pursuant to the plans, specifications, and related contract documents (collectively, the "Contract").~~

1)   Hartford ~~is willing to undertake to~~ shall complete all work, pursuant to the aforementioned ~~performance b~~Bond issued in favor of Sons of Confederate Veterans, which is hereby incorporated herein by reference, required by the Project plans and specifications, provided that ~~the entire remaining contract balance~~ amounts would have been payable to J.C. Duke under the Original Contract and any additional amounts which may be added to the ~~c~~Contract due to properly authorized extra work, insurance proceeds or executed change orders, ~~is~~ are paid to Hartford as set forth in the contract documents. ~~Sons of Confederate Veterans and~~ Hartford agrees with the letter by the Sons of Confederate Veterans dated September 26, 2012, that ~~the remaining contract balance is $811,701.44 with a current amount earned of $82,701.84 and a balance to earn of $286,649.65.~~ amounts unpaid under the Contract are as follows: (1) earned contract balance of $82,701.84 due for Pay Application No. 31, (2) balance to finish of $286,649.85, and (3) retainage of $525,051.79. Payment shall be ~~made~~ paid to Hartford on the same basis as payments would have been made to J.C. Duke under the Contract pursuant to payment applications in accordance with work that progresses on the Project~~, which shall be~~ and subject to review and approval by the project Architect as provided in the Contract. In accordance with the referenced letter of September 26, 2012, Sons of Confederate Veterans shall pay retainage to Hartford following final completion and acceptance of the Project, less liquidated damages and other offsets as permitted by the Contract, with both parties reserving all rights with regard to liquidated damages and other offsets asserted by Sons of Confederate Veterans.

2)   ~~Sons of Confederate Veterans acknowledges that~~ Hartford states that it is not a contractor and that Hartford will agree to complete or arrange for completion of the work in accordance with the Project plans and specifications. ~~It is understood and agreed by Sons of Confederate Veterans that~~ Hartford ~~may~~ intends to employ or

engage consultants, independent contractors or construction managers of its choosing for completing, and proceed to complete the work in any manner which Hartford, in its sole discretion, deems appropriate and expeditious. In accordance with the terms of the Bond. Hartford further states its understanding and expectation that Hartford and Sons of Confederate Veterans owe to each Sons of Confederate Veterans agrees to cooperate and assist Hartford and its consultants, independent contractors, or construction managers as set forth herein. other duties of cooperation with respect to the completion effort.

      3)    Hartford agrees to perform with reasonable speed is obligated to perform in accordance with the terms of the Bond all remaining work required by the eOriginal eContract with J.C. Duke, including all warranties and guaranties required to be provided by J.C. Duke, in accordance with pursuant to the terms and conditions of the Original Contract except as to time for completion of the Project, subject to the penal sum of the Performance Bond which is limited to and shall not exceed the penal sum of $10,488,000.

      4)    Hartford acknowledges that Sons of Confederate Veterans acknowledges, agrees, and represents to Hartford that it has knowledge of have pointed out to Hartford certain defects and deficiencies with the work on the Project. Hartford and Sons of Confederate Veterans reserves all rights and defenses as to the issue of whether said defects and deficiencies are the cause of were caused by J.C. Duke and/or its subcontractors, or by any other cause.

      5)    Sons of Confederate Veterans recognizes that Hartford may be liable to unpaid suppliers and subcontractors of J.C. DUKEuke. Hartford expects Sons of Confederate Veterans agrees not to make no any representations or promises of payment to those suppliers and subcontractors and to refer all such inquiries to Hartford.

      6)    Hartford agrees intends to obtain authorization and permission, if necessary, from the United States Bankruptcy Court for the Southern District of Alabama. In re: J. C. Duke & Associates General Contractors, Inc., Case No.: 12-00391-WSS-11, to negotiate a certain check from the Mississippi Windstorm Underwriting Association under a builder's risk insurance policy, representing payment for storm damage caused by Hurricane Isaac. The Sons of Confederate Veterans shall be entitled to reimbursement from such proceeds for damages and costs incurred or paid on account of Hurricane Isaac, and the remainder shall be paid to Hartford in exchange for Hartford's agreement fully to repair or remediate damage to the Project caused by Hurricane Isaac.

      7)    **Mutual Reservation of Rights.** Nothing in this letter is intended nor shall be construed to be contrary to or in any way to waive, limit, or otherwise adversely affect the rights and obligations of the parties arising under or related to the Bond issued by Hartford, as surety, to Sons of Confederate Veterans, as obligee, all of which rights are fully reserved by Hartford and by Sons of Confederate Veterans.

Sincerely,

Date: _____

_____ HARTFORD FIRE INSURANCE

BY: _____

Its _____

**Tarpley, Bethany**

From:            Purdy, Bill
Sent:            Wednesday, October 10, 2012 2:43 PM
To:              'Tom Selden'
Subject:         RE: USOCV/JDPL

The L&A case was wrongly decided and has been discredited. I should know. My former partner tried the case. But, you are right; this is moot insofar as Hartford's obligations having been triggered long ago, under either view.

Other offsets includes the adds/subtracts list the Architect has maintained which was discussed in the meeting at Beauvoir that you missed. For example, J.C. Duke installed nonconforming, inferior products (e.g. handrails) for which a credit is owed under the contract. Another example, as Hartford has been advised, the Obligee has had to go out of pocket to maintain the builder's risk policy, which was Duke's contractual responsibility. How can you possibly pretend to be unaware of such matters? At any rate, we're allowing this to be reserved by both parties.

The completion date is required by the contract Hartford bonded. Hartford is liable for all liquidated damages. Any suggestion to the contrary is absurd. Again, this has been reserved.

It is my understanding that the carrier based its estimate on costs of repair of the then visible damage. Before the adjuster ever showed up, the Obligee paid a significant amount, for example, to Service Master to get the water out and clean up the mess. I believe this was in the amount adjusted by the carrier, but Hartford can certainly verify that. Again, this was discussed in the meeting you missed.

ie Obligee has offered to assign to Hartford the Obligee's rights to the insurance check in our possession, allowing Hartford to continue negotiations with the carrier as Hartford deems appropriate. We have even given adjuster contact information to your client and your firm. Hartford does not have to agree in advance to any storm expense incurred by the Obligee, only that such issues are on the table for discussion and are not waived. (This could lead to another offset claim, however, if not promptly reimbursed).

Your added language is completely unnecessary, as the items you mention clearly arise out of or relate to the Original Contract and are nothing more than surplussage. If you insist, we would need to add to the surplussage "the Obligee's offsets and credits" to avoid what I am sure would be some claim later on that these were somehow waived by your ridiculous amendment.

In any event, unlike Hartford, the Obligee is not requiring Hartford to concede a single solitary thing. Both parties reserve all rights as to all issues. The is no good faith reason, none, for Hartford to continue to delay proceeding with the completion of the work as is its obligation under the Bond it issued.

I must inform you that if the project is not completed in accordance with MEMA requirements, MEMA has advised that it will demand reimbursement of the funds it has provided. Hartford is playing with a $10 million stick of dynamite. If I were you, I would stop this senseless quibbling and get on with the long overdue work which is putting the entire financing at risk.

From: Tom Selden [mailto:TSelden@starneslaw.com]
Sent: Wednesday, October 10, 2012 1:52 PM
: Purdy, Bill
bject: RE: USOCV/JDPL

Bill,

EXHIBIT

L

Please accept this e-mail as my initial comments regarding your letter of October 9.

First, I respectfully disagree with your comments regarding the point at which any obligations of Hartford may be triggered under the performance bond. *See L&A Contracting v. Southern Concrete Services, Inc.,* 17 F.3d 106 (5th Cir. 1994). That said, because the owner has now declared JC Duke to be in default, as required by the bond and the case law, it may be a moot point. I will discuss this with Hartford.

What are the "other offsets" you have added to paragraph no. 1? We cannot agree to the addition of the last sentence of that paragraph. As you know, Hartford disputes the assessment of liquidated damages. We fully understand the owner may seek LDs at he end of the day, and paragraph 7 reserves all rights to do so. The last sentence of paragraph no. 1, however, needs to be removed.

In paragraph no. 3, Hartford cannot agree to do the impossible by completing the Original Contract in May of 2011. Again, we understand the owner's position concerning the completion date, and all rights in this regard are specifically reserved.

As to paragraph no. 6, we need to know what the owner estimates the storm damages expenses will be. Did the carrier generate a report setting forth an estimate for the repairs?

I need to check with Hartford as to paragraph no. 7. At a minimum, I would like to add after "arising under or related to" the following: "the Original Contract with JC Duke, and all change orders and any claims for additional compensation thereunder, and...." This will precede " the Bond issued by Hartford, ...."

Again, I have not spoken with Hartford about your letter. There may be other issues we need to address after I do so.

Thank you,

Tom



## STARNES | DAVIS FLORIE LLP

Thomas L Selden - Attorney
100 Brookwood Place, 7th Floor, Birmingham, AL 35209
P.O. Box 598512, Birmingham, AL 35259-8512
(205) 868-6021 - Fax: (205) 868-6099 - www.starneslaw.com

**From:** Purdy, Bill [mailto:bpurdy@babc.com]
**Sent:** Tuesday, October 09, 2012 3:38 PM
**To:** Tom Selden
**Subject:** USOCV/JDPL
**Importance:** High

## BRADLEY ARANT BOULT CUMMINGS LLP

Post Office Box 1789
Jackson, MS 39215

Ph: 601/592-9962     Fax: 601/592-1462

William R. Purdy

2

Writer's Direct Dial: (601) 592-9962
Writer's E-mail: bpurdy@babc.com

Please see attached.

 **BRADLEY ARANT**
**BOULT CUMMINGS**

William R. Purdy
Bradley Arant Boult Cummings LLP
Suite 400, One Jackson Place
188 E. Capitol Street
Jackson, MS  39201

Post Office Box 1789
Jackson, MS 39215-1789
☎phone: (601) 592-9962 (direct)
🖷 fax: (601) 592-1462 (direct)
✉ e-mail: bpurdy@babc.com
ʊweb: http://www.babc.com

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

NOTICE: While this firm does not render tax advice, we nevertheless advise the following pursuant to IRS Circular 230 Disclosure: To comply with certain U.S. treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone (205) 868-6000 or by electronic mail, and delete this message and all copies and backups thereof. Thank you.

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

## Purdy, Bill

**From:** Purdy, Bill
**Sent:** Monday, October 15, 2012 10:12 AM
**To:** 'Tom Selden'
**Subject:** Beauvoir Project

I tried calling and left a voice mail.

I'm meeting with the Beauvoir Board of Directors tomorrow morning. We're out of time. Decisions have to be made.

Is there anything I can tell them as to whether Hartford intends to honor its Bond without forcing the Obligee to waive or compromise any of its rights? The Obligee is not asking Hartford to make any concessions or to waive any rights. Why isn't Hartford willing to proceed with its completion obligations on the same basis? If Hartford is so willing, when can the Obligee expect Hartford to get started?

William R. Purdy

Bradley Arant Boult Cummings LLP
Suite 400, One Jackson Place
188 E. Capitol Street

Jackson, MS 39201

Post Office Box 1789
Jackson, MS 39215-1789

' (601) 592-9962 (direct)
7 (601) 592-1462 (direct)
* bpurdy@babc.com <mailto:bpurdy@bradleyarant.com>

1


EXHIBIT
M

# STARNES | DAVIS FLORIE LLP

W. Drake Blackmon
P.O. Box 598512
Birmingham, AL 35259-8512
Phone: (205) 868-6061
Facsimile: (205) 868-6099
E-mail: dblackmon@starneslaw.com

October 15, 2012

*Via E-mail and U.S. Mail*
Mr. William R. Purdy
Bradley Arant Boult Cummings LLP
Suite 400, One Jackson Place
188 E. Capitol Street
Jackson, MS 39201

RE:  Project:    Jefferson Davis Presidential Library and Museum
Reconstruction
Owner/Obligee:  Mississippi Division, United Sons of Confederate
Veterans, Inc.
Surety: Hartford Fire Insurance Company
Principal: J.C. Duke & Associates General Contractors, inc.
Our File No: 29245

Dear Bill:

After a thorough investigation by Hartford, including a site visit to the Project with a completion contractor and consultant almost directly after your client declared J.C. Duke to be in default as required by the performance bond, and after numerous attempts to work with you so that the surety could proceed with the takeover work on the Project, it is apparent that we will not be able to reach an agreement that will allow Hartford to proceed with takeover work using a completion contractor.

Your unreasonable demands upon Hartford, including your insistence that the surety agree to liquidated damages that we adamantly dispute, and your demands that we agree to a completion date of May 2011, after your client failed to mitigate damages by, among other things: 1) improperly administering the Project and insisting on using J.C. Duke over a year and a half after the initial completion date (and after J.C. Duke filed for bankruptcy in early 2012)[1]; and 2) grossly delaying the termination of the contract with J.C. Duke and not declaring a default until September 2012, as required by the bond and applicable law, after which your client has insisted that Hartford complete the work on

---

[1] Your suggestion that Hartford has somehow prevented J.C. Duke from proceeding with work on the Project is absurd and offensive.

{B1491718}

EXHIBIT
N

October 15, 2012
Page -2-

the Project by November 8, 2012, show that you and your client are not only being unreasonable, but are attempting to put Hartford in a position which will cause the surety significant prejudice and damage. Hartford further disagrees with your insistence on certain credit offsets that you allege will be assessed against the surety. Moreover, you assert that certain work already installed is now deficient, including, among other things, the window system, portions of the roof, and exterior stone panels which you claim are discolored, for which Hartford disputes it is responsible at this time without further investigation, as this may also be a case of your client's failure to properly inspect the work or an abuse of discretion in approving non-conforming work. All of these issues, among others, show that Hartford has been prejudiced by your client and that your client is continuing to attempt to do as it pleases without any regard to the surety's rights.

Accordingly, Hartford will not be taking over the work on the Project, but will instead allow your client to retain its own contractor to complete the work for the Project fully on its own, as you have indicated your client wants to do. Hartford will, following its investigation of the work performed by the Obligee's contractor, make a determination of funds that Hartford believes may be due from the performance bond to complete the contract. Please submit any costs, expenses, and other charges for which you believe Hartford is responsible under the bond to our attention as work progresses and Hartford will, following its investigation, make any payments for reimbursement for work on the Project that it deems are necessary, appropriate, reasonable, and allowable by law.

We trust you understand that all rights, claims and defenses of Hartford, as surety, that are allowable under the bond, the contract between J.C. Duke and your client, and applicable law, are fully reserved.

Sincerely,

Starnes Davis Florie LLP

W. Drake Blackmon

cc:   Mr. Gary Judd
      Mr. Tom Selden



BRADLEY ARANT
BOULT CUMMINGS LLP

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1462
bpurdy@babc.com

October 29, 2012

**VIA E-MAIL**
DBlackmon@starneslaw.com
**AND U.S. MAIL**
W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

|  | | |
|---|---|---|
| RE:  SURETY | : | Hartford Fire Insurance Company ("Hartford") |
| OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. ("Obligee") |
| PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. ("Duke") |
| PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction ("JDPL Project") |

Dear Mr. Blackmon:

This is the response of the Mississippi Division, United Sons of Confederate Veterans, Inc. ("Obligee") to your letter of October 15, 2012, written on behalf of Hartford Fire Insurance Company ("Hartford"). Each of Hartford's statements is followed by what actually occurred.

> **Hartford:**   Hartford's "thorough investigation".

> **The Truth:**   The Obligee does not know what Hartford did do, but the Obligee does know what Hartford did not do. Hartford did not include Larry Albert or Chris Robinson of Albert & Associates, PA ("Architect") or representatives of the Obligee in Hartford's investigation, except for a single meeting at the JDPL Project site on September 18, 2012, with most of the time being consumed in a walk-through of the building. Paying attention to only what Hartford wanted to hear from Hartford's paid consultants does not constitute a "thorough investigation".

> **Hartford:**   Project meeting occurred "almost directly" after Obligee declared Duke to be in default.

> **The Truth:**   Duke abandoned the JDPL Project on August 10, 2012, and Duke formally declared itself in default by letter dated August 17, 2012. Hartford was well aware

EXHIBIT

O



W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
October 29, 2012
Page 2

of these events as they occurred. Hartford even advised the Obligee of Duke's default by letter dated August 16, 2012, which was acknowledged back to Hartford by e-mail the same day. Under these circumstances and given that the JDPL Project was very close to completion, the Obligee does not agree with Hartford's implication that it acted promptly in not meeting with the Obligee until over a month later.

<u>Hartford</u>:  Hartford was unable to reach an agreement that would allow Hartford to proceed with takeover work using a completion contractor.

<u>The Truth</u>:  Such an agreement already existed. The Bond which Hartford executed on April 9, 2009, not only gave Hartford the right but imposed the obligation upon Hartford to promptly remedy Duke's default, including the express option to "Procure the completion of the Contract in accordance with its terms and conditions." The Obligee repeatedly demanded Hartford to perform in accordance with its Bond.

<u>Hartford</u>:  The Obligee insisted that Hartford "agree to liquidated damages".

<u>The Truth</u>:  Throughout this process, the Obligee consistently assured Hartford that it did not have to "agree" to anything and could reserve its rights to everything, including liquidated damages. For example, on October 10, 2012, I e-mailed Tom Selden: "In any event, unlike Hartford, the Obligee is not requiring Hartford to concede a single solitary thing. Both parties reserve all rights as to all issues." In the morning of October 15, 2012, prior to receipt of your letter, I e-mailed Tom Selden again repeating: "The Obligee is not asking Hartford to make any concessions or to waive any rights. Why isn't Hartford willing to proceed with its completion obligations on the same basis?"

Exactly opposite of your statement, Hartford refused to proceed with its obligations unless the Obligee forfeited all rights to liquidated damages, specifically spelled out by the contract Hartford bonded. See Tom Selden's letter of October 5, 2012, demanding payment of all contract funds and waiver of the contractual time to complete, which letter was preceded by numerous drafts of so-called takeover agreements, all of which required the Obligee to waive liquidated damages.

Implied in your letter, but not expressly stated, is Hartford's position articulated by Gary Judd in the September 18 meeting at Beauvoir, that somehow the Obligee "waived" its rights to liquidated damages by allowing Duke to continue working beyond the contract completion date of May 2011. The Bond itself expressly provides in Part V, GENERAL CONDITIONS, section 3 that no "forbearance" on the part of the Obligee, i.e. in permitting Duke to continue working, will release the Surety [Hartford] from its liability under the Bond, or any portion thereof, "notice to the Surety of any such . . . forbearance being expressly waived." Mr. Judd's waiver argument is exactly backwards. The Obligee did not waive liquidated damages, but instead the Bond waived Hartford's right to contend that such forbearance in any way released Hartford or Duke from their respective liabilities. Since the bonded contract provided for liquidated damages, Hartford is subject to the same liquidated damages as Duke. <u>National Fire Insurance Company of Hartford v. Fortune Construction</u>

W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
October 29, 2012
Page 3

Company, 320 F.3d 1260, 1275-1276 (11th Cir. 2003)(liquidated damages provisions in underlying contract consider part of performance bond).

**Hartford**: The Obligee demanded that Hartford agree to a completion date of May 2011.

**The Truth**: The contract that Hartford bonded specified a completion date of May 2011. The Bond requires Hartford to promptly complete the bonded contract as written. As noted above, Hartford demanded that the Obligee waive the contract completion date (and thereby forfeit liquidated damages to which the Obligee was entitled under the contract).

**Hartford**: The Obligee improperly insisted upon using Duke over a year and a half after the initial completion date.

**The Truth**: In direct contradiction of your statement, I wrote Mr. Selden on August 31, 2012, as follows: "MDUSOCV [the Obligee] calls upon Hartford to rectify Duke's default as promptly as possible. It is up to Hartford to determine whether this is best done through Duke or by others or some combination."

**Hartford**: Hartford is offended by the Obligee's suggestion that Hartford prevented Duke from proceeding to complete the JDPL Project.

**The Truth**: On August 17, 2012, Duke wrote the Obligee that Hartford's action in redirecting Duke's receivables to Hartford made it impossible for Duke to continue with the JDPL Project. This seems indisputably true, since Hartford's own letter of August 16, 2012, demanded that all Duke's receivables should be paid to Hartford.

**Hartford**: The Obligee grossly delayed terminating Duke and not declaring a default until September 2012.

**The Truth**: Duke abandoned the JDPL Project on August 10, 2012, and Duke declared itself in default on August 17, 2012. I e-mailed Hartford's Gary Judd on August 16, 2012, referring to Hartford's letter of that same date and confirming "the principal's [i.e. Duke's] default". The Obligee again confirmed Duke's default by letter dated August 31, 2012, addressed to Mr. Selden.

The Obligee believes that your reference to delayed termination could refer not to the events in August and September 2012 but rather to the fact that Duke was still working in 2012 on a contract scheduled to be completed in May 2011. Hartford apparently thinks that Duke should have been terminated at some earlier time, but Hartford gives no indication of when this earlier time was or what the basis of termination would have been.

Such a contention is especially mysterious since Hartford had been involved with Duke's bankruptcy since early 2012 and with the bankruptcy court's Cash Collateral Order on use of bonded receivables to pay for work on bonded projects, including the JDPL Project. Presumably, Hartford informed itself about these Projects but no questions were

W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
October 29, 2012
Page 4

posed to the Obligee about Duke's delays in the months that Hartford was interacting with Duke about bonded work remaining to be performed, including the JDPL Project.

If Hartford had inquired in early 2012, instead of waiting several months later to second-guess the Obligee, I suspect the Obligee would have advised Hartford that while the Obligee was dissatisfied with the pace of work, Duke was still on the job trying and was still making progress, which benefited Hartford. In this regard, one must conclude Hartford's supposedly "thorough investigation" did not entail examination into Mississippi law which sets a very high bar for justifying termination of a contract. Under Mississippi law, contract termination is considered an "extreme" remedy which is "sparsely" granted and only for a failure so severe that it substantially defeats the purpose of the contract. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., 525 So. 2d 746, 756 (Miss. 1987). Duke's lack of progress and deficiencies in work never came close to this standard.

Further, with specific reference to delayed performance, the Mississippi Supreme Court has stated, "[t]he mere fact there was a delay in the performance of a building contract will not terminate nor justify rescinding it." Bevin Construction Company v. Kittrell, 139 So. 2d 375, 379 (Miss. 1962). Instead, confronted with delays in performance, the Obligee's remedy is not termination but damages in a sum to finish the construction "together with such other damages due [the Obligee] growing directly out of the failure of [the contractor] to carry out its contract and understanding." Id. at 380. No doubt, if the Obligee had terminated Duke sooner, then Hartford would be arguing wrongful termination.

Hartford:    The Obligee insisted that Hartford complete the work on the Project by November 8, 2012.

The Truth:    Through my letter of August 31, 2012 to Tom Selden, the Obligee advised Hartford that, because of Hartford's foot-dragging in getting the work re-started, "[t]he window of opportunity is in jeopardy for bringing the JDPL Project to completion before the long-planned fundraiser set for November 8." It was believed then (and still is) that approximately 60 days of work would be needed to finish the JDPL Project, so that completion by the November 8 date was still possible as of August 31, 2012.

While the Obligee was gravely disappointed that Hartford's delays prevented achievement of the vitally important goal of completion before this critical November 8 fundraiser of which Hartford was made aware, the Obligee cooperatively responded within one day to Hartford's request a month later for "red alert" items to get done first before the fundraiser, in recognition that full completion was no longer possible. See e-mail exchange of September 25-26, 2012. Of course, Hartford did not do any of these things which Hartford itself characterized as "red alert" items.

Hartford:    The Obligee insisted on certain credit offsets that would be assessed against Hartford.

The Truth:    As requested by Hartford, the Obligee forwarded to Hartford a compilation of "adds/deducts" which the Architect had been compiling during the course of

W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
October 29, 2012
Page 5

construction, reflecting a net reduction to the contract amount. See e-mail sent to Tom Selden, dated October 11, 2012. In this transmittal, I expressly told Mr. Selden: "The Obligee is not asking Hartford to agree to any of these items as a condition for commencing work, just as the Obligee has not yet agreed to any of them. Under the contract, none of those items are valid and binding until incorporated by a written change order executed by the Obligee. It is understood that both parties [i.e. Hartford and the Obligee] reserve all rights as to the validity and amounts of these items, individually and collectively."

**Hartford:**    Certain work already installed is deficient for which Hartford disputes it is responsible and which may have been caused by the Obligee's failure to properly inspect.

**The Truth:**    The work is not complete. Every item to which Hartford alludes has been addressed in Architect's Field Reports, meetings, job site discussions, etc., through which Duke and the affected subcontractors were advised of their deficiencies and directed to take corrective action. The deficiencies became known precisely because the work was properly inspected. Additionally, contract funds have been withheld in amounts adequate to pay others to correct the deficient work, if the responsible subcontractors refuse to do so.

Hartford's comments about work deficiencies prove Hartford's stunning disregard of the fundamental purpose of the Performance Bond. The Mississippi Division, United Sons of Confederate Veterans, Inc. is the "Owner" of the JDPL Project, as well as Obligee under Hartford's Bond. Duke is the contractor. It is Duke's responsibility to install the work correctly. The Owner has no part of the installation process, and the Owner is not responsible for work which is not properly installed. The only obligation the Owner has with respect to deficiencies is to inspect for them and to hold sufficient funds to ensure the deficiencies are corrected. The Owner/Obligee has done this.

Duke is Hartford's principal. The Obligee is the party to whom Hartford owes the obligation to remedy Duke's defaults, including deficiencies in performance, if Duke fails to correct them. The fact that Hartford would raise deficiencies in work not yet completed as an excuse to run from its obligations is a gross perversion of the fundamental promise Hartford made in furnishing the Bond to begin with.

Furthermore, it is noted that, under Mississippi law, deficient work is not grounds for termination. Instead, even shoddy workmanship, so long as correctible, is not cause for contract termination. Sumrall Church of the Lord v. Johnson, 757 So. 2d 311, 315 (Miss. App. 2000).

**Hartford:**    Deficient work may be caused by an abuse of discretion in approving non-conforming work.

**The Truth:**    To my knowledge, the Obligee has not accepted nor paid for deficient work and the Obligee has not approved "non-conforming" work, except perhaps in one limited circumstance. The Obligee's construction contract with Duke, which Hartford bonded, expressly authorizes the Owner/Obligee, in its discretion, to accept work not in accordance with the contract in exchange for a reduction in the contract amount. See

W. Drake Blackmon, Esq.
Starnes Davis Florie, LLP
October 29, 2012
Page 6

Section 12.3 of the General Conditions of the Contract for Construction, AIA Document A201-2007 Edition. If such a credit has been taken under these circumstances, it would hardly be an abuse of discretion but an option expressly given the Obligee under the contract Hartford has bonded.

**Hartford:** All these issues show Hartford has been prejudiced by the Obligee and that the Obligee is continuing to do as it pleases without regard to Hartford's rights.

**The Truth:** The truth is exactly opposite. The fact is that Hartford has attempted to bulldoze the Obligee into surrendering valuable rights provided by Hartford's Bond and, when the Obligee did not submit to Hartford's bullying tactics, Hartford abandoned the Obligee, just as Duke had done. Hartford acts in bad faith.

**Hartford:** After the Obligee finishes the JDPL Project on its own, Hartford will make a determination of the funds that Hartford believes may be due.

**The Truth:** "Doing nothing" is not one of the options under the Bond. By flagrantly abandoning its obligations under the Bond, Hartford has forfeited any right to receive any payment from the Obligee pursuant to the Performance Bond. National Fire Insurance Company of Hartford v. Fortune Construction Company, 320 F.3d 1260, 1273 (11th Cir. 2003) (because surety did not perform express obligations under the performance bond, the surety had no performance subrogation claim under the bond). In Hartford's typical style, Hartford has abandoned its obligations under the Bond and then has the nerve to start making further demands on the Obligee. The Obligee has no choice but to mitigate damages as best it can by completing the JDPL Project as dictated by Hartford and, when or if the net contract balance is exhausted, the Obligee will submit its excess expenses to Hartford for reimbursement.

The Obligee has tried to set the record straight about the inaccuracies and outright misrepresentations of Hartford's letter of October 15, 2012. If there is some wording that has not been expressly addressed, it is unintended. The Obligee disagrees with everything in and about Hartford's letter of October 15, 2012, which itself constitutes irrefutable proof of Hartford's bad faith.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy

WRP/mn

cc:     Mr. Thomas L. Selden *(via email and U.S. Mail)*
        Mississippi Division, United Sons of Confederate Veterans, Inc.



**BRADLEY ARANT**
**BOULT CUMMINGS**

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1482
bpurdy@babc.com

July 10, 2013

**VIA E-MAIL**
tselden@starneslaw.com
**AND FEDERAL EXPRESS**
Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

|  |  |  |  |
|---|---|---|---|
| RE: | SURETY | : | Hartford Fire Insurance Company |
| | OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
| | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
| | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |
| SUBJECT: | Recapitulation of Owner's Expenses and Damages | | |

Dear Mr. Selden:

On behalf of the Mississippi Division, United Sons of Confederate Veterans, Inc., ("Owner") which is the Obligee under bonds issued by Hartford Fire Insurance Company ("Hartford"), I submit to Hartford, through you, a recapitulation of the Owner's costs and damages incurred as a result of Hartford's bad faith refusal to honor its obligations owed to the Owner under the subject Performance Bond furnished by Hartford on behalf of J.C. Duke & Associates General Contractors, Inc. ("Duke"), which defaulted on its contract and abandoned the Project.

Excluding attorneys' fees (which are approximately $100,000 and continuing), the Owner has to date paid costs, incurred payment obligations, and suffered damages as a result of the defaults and abandonment of the referenced Project by J.C. Duke & Associates Contractors, Inc. ("Duke") in excess of Duke's unpaid contract balance. Additionally, there remain deficiencies in work performed by Duke or for which Duke is responsible in an amount estimated to be in excess of one million dollars ($1,000,000).



EXHIBIT

P

BIRMINGHAM  •  CHARLOTTE  •  HUNTSVILLE  •  JACKSON  •  MONTGOMERY  •  NASHVILLE  •  WASHINGTON DC

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
July 10, 2013
Page 2

_____

    While the attached reconciliation provides more detail, the following summarizes the main categories:

| | |
|---|---|
| Original Contract Sum | $10,488,000.00 |
| Contract Adjustments as of Duke's Default on 8/10/12 | <197,911.35> |
| Adjusted Contract Sum as of 8/10/12 | $10,290,088.65 |
| Payments Made to Duke (Draws 1-30) | <9,606,632.46> |
| Adjusted Contract Sum at Time of Duke's Default | $683,456.19 |
| Payments Made or Costs Incurred to Complete Duke's Defaulted Work | |
|    Subcontractors | <299,874.54> |
|    Vendors and Consultants | <313,939.22> |
| Liquidated Damages (from Default on 8/10/12 to Substantial Completion of 2/4/13) | <89,000.00> |
| Costs and Damages in Excess of Adjusted Contract Balance (Excluding Attorneys Fees) | <19,357.48> |

    Once attorneys' fees are considered, the Owner has incurred costs in completing the Project well in excess of $100,000 more than Duke's adjusted contract balance, and the Owner still faces very substantial expense to remedy deficiencies in work performed by Duke. See the attached reconciliation and supporting documentation.

_____

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
July 10, 2013
Page 3

---

The Owner hereby makes demand under Hartford's Performance Bond for payment by Hartford of the Owner's excess costs and damages and for remedying the remaining deficiencies in Duke's work. The Owner reserves all rights to amend this demand as more information becomes available, particularly pertaining but not limited to estimates for remedying deficiencies in Duke's work which permit water intrusion into the interior of the JDPL and costs incurred in putting the fire alarm and security system in acceptable working order. The Owner further reserves all rights to consequential, exemplary, and punitive damages as a result of Hartford's bad faith abandonment of its Bond obligations and other improper conduct toward the Owner.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy
Attorney for Mississippi Division, United Sons
of Confederate Veterans, Inc. ("Owner")

WRP/kh

cc:     Mississippi Division, United Sons of Confederate Veterans, Inc.

---



BRADLEY ARANT
BOULT CUMMINGS

William R. Purdy

Direct Dial: 601/592-9962
Direct Fax: 601/592-1482
bpurdy@babc.com

July 30, 2013

**VIA E-MAIL**
tselden@starneslaw.com
**AND U.S. MAIL**
Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
100 Brookwood Place
7th Floor
Birmingham, AL 35259

| | | | |
|---|---|---|---|
| RE: | SURETY | : | Hartford Fire Insurance Company |
| | OWNER/OBLIGEE | : | Mississippi Division, United Sons of Confederate Veterans, Inc. |
| | PRINCIPAL | : | J.C. Duke & Associates General Contractors, Inc. |
| | PROJECT | : | Jefferson Davis Presidential Library and Museum Reconstruction |
| SUBJECT: | Updated and Corrected Recapitulation of Owner's Expenses and Damages | | |

Dear Mr. Selden:

This follows my letter to you of July 10, 2013, concerning the referenced matter, which forwarded to Hartford Fire Insurance Company ("Hartford") on behalf of the Mississippi Division, United Sons of Confederate Veterans, Inc. ("Owner") which is the Owner of the subject Project and Obligee under Hartford's Performance Bond ("Bond"), a notebook of documents substantiating costs and damages incurred by the Owner in completing the Project and otherwise pertaining to the Project.

Since that letter, I have forwarded additional backup information to be included in the notebook of expense documentation. With this letter, I attach a more detailed estimate of the costs to effectuate the repairs indicated by the Exterior Envelope Investigation Report of Water Management Consultants & Testing, Inc., contained in Exhibit 42 in the documents notebook. That estimate totals $1,334,695.84 and should also be put in Exhibit 42 of the notebook.

**EXHIBIT**

**Q**

Thomas L. Selden, Esq.
Starnes Davis Florie, LLP
July 30, 2013
Page 2

Along with this estimate, I have provided an updated and corrected summary of the Jefferson Davis Presidential Library and Museum Construction Contract Reconciliation which you should substitute for the summary sent with my July 10 letter.

With regard to the Report of Water Management Consultants & Testing, Inc. (notebook Exhibit 42), Hartford should make its own investigations and analyses as regards who may be liable for the defective conditions described. All of the work in question appears to have been performed by or on behalf of Hartford's bond principal, J.C. Duke & Associates General Contractors, Inc. ("Duke"), prior to Duke's default and abandonment of the Project on August 10, 2012. Despite repeated requests to Duke, subcontract files were never provided to the Owner, and the Owner has insufficient information to determine which subcontractors may be responsible for the particular deficiencies identified. Hartford should therefore make its own determinations about what demands should be made on which subcontractors and whether further payments should be made to subcontractors until their incomplete or improper work has been fully remedied.

The Mississippi Division, United Sons of Confederate Veterans, Inc. ("Owner") .... reiterates its demand upon Hartford, pursuant to the Bond, to promptly pay the Owner's costs and damages in excess of the adjusted contract balance and to immediately undertake repair and correction of remaining deficiencies noted with respect to exterior stone discoloration, unacceptable finish and appearance of the exterior portraits and state seals, water intrusion through the exterior building envelope, and the fire alarm/security system. Repairs to the building envelope are particularly urgent as ongoing water infiltration into the Library and Museum interiors risks continued damages to building finishes, components, and valuable contents.

The Owner reserves all rights to amend this demand as additional information becomes available. The Owner further reserves all rights to consequential, exemplary, and punitive damages as a result of Hartford's bad faith abandonment of its Bond obligations and other improper, bad faith conduct toward the Owner.

Sincerely,

BRADLEY ARANT BOULT CUMMINGS, LLP

William R. Purdy
Attorney for Mississippi Division, United Sons
of Confederate Veterans, Inc. ("Owner")

WRP/kh
Enclosures

cc: Mississippi Division, United Sons of Confederate Veterans, Inc.

BIRMINGHAM · CHARLOTTE · HUNTSVILLE · JACKSON · MONTGOMERY · NASHVILLE · WASHINGTON DC

## JEFFERSON DAVIS PRESIDENTIAL LIBRARY AND MUSEUM
## CONSTRUCTION CONTRACT RECONCILIATION

**I.      Contract Sum as of Duke Abandonment/Default - 8/10/12**

| | |
|---|---|
| **Original Contract Sum**<br>**(Exhibit 1)** | $10,488,000.00 |
| **Change Order No. 001**<br>**(Exhibit 2)** | 4,260.00 |
| **Change Order No. 002**<br>**(Exhibit 3)** | 8,775.74 |
| **Architect's "Adds/Subtracts"**<br>**(Exhibit 4)** | 19,552.91 |
| **Liquidated Damages as of 8/10/12**<br>**(5/16/11 – 8/10/12 = 452 days @ $500 = $226,000.00**<br>**(Exhibit 5)** | <226,000.00> |
| **Adjusted Contract Sum of Time of Default** | $10,294,588.65 |
| **Payments Made to J.C. Duke Draws 1-30**<br>**(Exhibit 6)** | <9,606,132.46> |

**Contract Balance at Time of Default**        **$688,456.19**

**II.     Payments Following Duke's Abandonment and Default of 8/10/12**

    **A.      Completion Subcontractors**

        **1.      Amounts Paid**

**Choate, USA (Landscaping)**
**(Exhibit 7)**

| | | |
|---|---|---|
| Check No. 13440 | $7,193.40 | |
| Check No. 13474 | 18,453.00 | |
| Check No. 13489 | 378.60 | <26,025.00> |

**Islander Stucco Systems (Stucco)**
**(Exhibit 8)**

| | | |
|---|---|---|
| Check No. 13442 | $12,326.25 | |
| Check No. 13466 | 3,648.45 | <15,974.70> |

**SA Signs (Lettering)**
**(Exhibit 9)**

| | | |
|---|---|---|
| Check No. 13450 | $5,124.00 | |
| Check No. 13481 | 8,151.00 | <13,275.00> |

**Kone, Inc. (Elevator)**
**(Exhibit 10)**

| | | |
|---|---|---|
| Check No. 13454 | $12,526.15 | |
| Billed | 2,137.37 | <14,663.52> |

**3-D Glass Co. (Storefront)**
**(Exhibit 11)**

| | | |
|---|---|---|
| Check No. 13462 | | <24,105.90> |

**O'Brien Flooring (Carpet, Tile, Granite)**
**(Exhibit 12)**

| | | |
|---|---|---|
| Check No. 13455 | $40,835.00 | |
| Check No. 13457 | 26,484.00 | <67,319.00> |

**Weaver Mechanical (Mechanical)**
**(Exhibit 13)**

| | | |
|---|---|---|
| Check No. 13469 | $28,329.44 | |
| Check No. 4144* | 3,147.71 | <31,477.15> |

*(replaces lost
Check No. 13475)

**Moses Electric (Electrical)**
**(Exhibit 14)**

    Check No. 13494                <51,436.73>

**Martin Smith Services (Wire Mesh)**
**(Exhibit 15)**

    Check No. 13477                <6,980.00>

**Bonds Services (Cleaning)**
**(Exhibit 16)**

    Check No. 13463             <u><5,600.00></u>       <256,857.00>

        2.     **Amounts Owed to Subcontractors But Not Paid Pending Receipt of Payment Request**

Advance Fire Protection         $9,326.00
(entire contract)(Exhibit 17)

Melvin Pierce Painting         14,291.45
(entire contract)(Exhibit 17)

O'Brien Flooring (retainage)      2,149.00
(see Ex. 17)

O'Brien Flooring (retainage)      3,894.00
(see Ex. 17)

Saucier Bros. Roofing        <u>13,357.00</u>      <43,017.45>
(Exhibit 17)

**Total Paid or Due Subcontractors**             **<$299,874.45>**

    **B.**     **Vendor Payments Post-Duke Default**

**Fox Everett, Inc. (Builder's Risk)**
**(Exhibit 17)**

    Check No. 13403             $21,637.69

    Check No. 13404             21,637.69

    Check No. 13409             21,450.00

Check No. 13423      <u>21,450.00</u>      <86,175.38>

**Mississippi Windstorm Underwriting Association**
**(Wind/Hail Coverage)**
**(Exhibit 19)**

Check No. 4131      $4,598.00

Check No. 13417      <u>4,518.00</u>      <9,116.00>

**Roy Anderson Corp (Construction Manager)**
**(Exhibit 20)**

Check No. 13432      $31,596.55

Check No.13449      41,380.14

Check No.13470      36,230.58

Check No.13478      32,536.48

Check No.13491      <u>7,298.66</u>      <149,042.41>

**Nextaff**
**(Exhibit 21)**

Check No. 13412      $548.10

Check No. 13416      252.00

Check No. 13419      252.00

Check No. 13421      214.20

Check No. 13431      945.00

Check No. 13437      302.40

Check No. 13439      1,031.80

Check No. 13443      1,045.80

Check No. 13446      560.70

Check No. 13448      837.90

| | | |
|---|---|---|
| Check No. 13460 | 730.80 | |
| Check No. 13468 | 365.40 | |
| Check No. 13491 | <u>343.35</u> | <7,429.45> |

**Richard V. Forte, Sr. (Owner Supervision)**
**(Exhibit 22)**

| | | |
|---|---|---|
| Check No. 12767 | 4,416.67 | |
| Check No. 12852 | 4,416.67 | |
| Check No. 12915 | 4,416.67 | |
| Check No. 12985 | <u>4,416.67</u> | <17,666.68> |

**Albert & Associates Architects**
**(Exhibit 23)**

| | | |
|---|---|---|
| Check No. 13407 | $2,051.06 | |
| Check No. 13408 | 6,006.06 | |
| Check No. 13414 | 2,816.06 | |
| Check No. 13427 | <u>5,347.12</u> | <16,220.30> |

**3-D Glass Co.**
**(Exhibit 24)**

| | |
|---|---|
| Check No. 13426 | <279.60> |

**Capitol Hardware Company**
**(Exhibit 25)**

| | |
|---|---|
| Check No. 13418 | <550.00> |

**Castone Corporation**
**(Exhibit 26)**

| | |
|---|---|
| Check No. 13458 | <4,694.69> |

**Crosby Surveying**
**(Exhibit 27)**

    Check No. 4141                                     <300.00>

**Commercial Millwork Specialist**
**(Exhibit 28)**

    Check No. 13464                                   <3,800.00>

**D&L Fire & Safety Company**
**(Exhibit 29)**

    Check No. 13428        $1,122.00

    Check No. 13435          66.00            <1,188.00>

**Delta Sanitation (Waste Pro)**
**(Exhibit 30)**

    Check No. 13429                                   <2,338.16>

**Gulfport Industrial Supply**
**(Exhibit 31)**

    Check No. 13453                                   <1,267.00>

**Kevin Knowles (Bulldozer Work)**
**(Exhibit 32)**

    Check No. 13456                                   <1,200.00>

**Magee's Masonry**
**(Exhibit 33)**

    Check No. 13436                                   <3,800.00>

**Tony Mitchell (Welding)**
**(Exhibit 34)**

    Check No. 13438        $1,025.00

    Check No. 13472        1,966.25          <2,991.25>

**Moses Electric Service, Inc.**
**(Exhibit 35)**

    Check No. 13467                                       <2,958.25>

**United Site Services**
**(Exhibit 36)**

    Check No. 13413         $208.85

    Check No. 13434         208.85

    Check No. 13451         <u>208.85</u>               <626.55>

**Vision Landscape Supply**
**(Exhibit 37)**

    Check No. 13483                                  <1,287.50>

**Waste Pro**
**(Exhibit 38)**

    Check No. 13441         65.00

    Check No. 13445         460.00

    Check No. 13459         <u>483.00</u>             <1,008.00>

**Vendor Subtotal (excluding legal expenses)**             <313,939.22>

III.   **Liquidated Damages for 8/10/12 – 2/04/13 = 178**          <89,000.00>
      **days @ $500**
      **(Exhibit 39)**

**Damages Incurred in Excess of Contract Balance**          <$14,357.48>
**(Excluding Attorneys' Fees)**

IV.   **Estimates for Repair of Remaining Deficiencies**
     **in Duke's Work**

    Discoloration of Exterior Stone           <$887,182.00>
    **(Exhibit 40)**

| | |
|---|---|
| Unacceptable Darkness and Shade Variations in Portraits and Unacceptable Appearance of State Seals **(Exhibit 41)** | <33,085.00> |
| Water Intrusion **(Exhibit 42)** | <1,334,695.84> |
| Fire Alarm/Security System **(Exhibit 43)** | Cost Undetermined |
| Total Estimates for Repairs of Remaining Deficiencies in Duke's Work (Excluding Fire Alarm/Security System) | <$2,254,962.84> |

V.  **Total Costs and Damages**
**(Excluding Attorneys' Fees and Repairs to Fire Alarm/Security System)**

| | |
|---|---|
| Damages Incurred in Excess of Contract Balance (Excluding Past and Continuing Attorneys Fees) | <$14,357.48> |
| Estimated Repairs of Remaining Deficient Conditions (Excluding Fire Alarm/Security System) | <2,254,962.84> |
| Total | <$2,269,320.32> |



**ROY ANDERSON CORP**
C O N T R A C T O R S
AN ANDERSON COMPANY

Post Office Box 2
Gulfport, Mississippi 39502
Office 228.896.4000
Fax 228.096.4078
rac.com

July 26, 2013

Mr. Rick Forte
2244 Beach Blvd.
Biloxi, MS 39531
P  228-388-4400
rforte@beauvior.org

RE:   Jefferson Davis Presidential Library Repairs

Dear Mr. Forte:

Enclosed is the worksheet and back-up pricing, to perform the building envelope
and roof repairs on the Jefferson Davis Presidential Library.  Thank you very
much for the opportunity to provide this estimate, and we are available at your
convenience to review any of the information provided.

Sincerely,

**ROY ANDERSON CORP**

David Mauffray, Jr.
Project Manager

Enclosures

Cc:   Bill Purdy - Bradley Arant Boult Cummings LLP
       Rick Medlin – Roy Anderson Corp

Page 1 of 1

*SAFETY – It's the Lifeline of Our Business*

| General Contractor | | | | | |
|---|---|---|---|---|---|
| **Roy Anderson Corp.** | | | P. O. Box 2, Gulfport, MS 39502 | | |
| | | | Phone (228) 896-4000   Fax (228) 896-4088 | | |

| Cost Summary Worksheet | | | | Project: | 27-Jul-13 FGD Units 1 & 2 - Foundations Package - Phase I |
|---|---|---|---|---|---|
| | | | | Contract No: | |

| | Labor (A) | Materials (B) | Equipment (C) | Parties Involved | Subcontract Amount (D) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Water Management Consultants | $ 54,175.00 |
| | | | | Kemco, Inc. | $ 1,125,000.00 |
| | | | | Saucier Brothers Roofing | $ 72,000.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Subtotal** | $0.00 | $0.00 | $0.00 | | $1,251,175.00 |
| | | | Total ------ Columns (A) + (B) + (C) + (D)  = | | $1,251,175.00 |
| | | | | | |
| | General Liability | 1.00% | | | $ 15,223.72 |
| | Builders Risk Insurance | 0.00% | | | $ - |
| | Subguard/Sub Bonds | 1.20% | | | $ 15,014.10 |
| | Safety & Warranty | 0.00% | | | $ - |
| | Gross Receipts Tax | 3.50% | | | $ 53,283.02 |
| | Cost of Work | | | | $1,334,695.84 |
| | | | | | $ - |
| | RAC's Mark Up, OH & P | 15.00% | | | $ 187,876.25 |
| | | | | **GRAND TOTAL** | $1,522,372.09 |





# Water Management Consultants & Testing, Inc.

## WMC

July 23, 2013

Roy Anderson Corp
Rick Medlin
P O Box 2
Gulfport, MS 39502
P 228-896-4000
F 228-896-4086
rick.medlin@rac.com

RE:   Jefferson Davis Presidential Library (JDPL)
       Biloxi, Mississippi

Dear Mr. Medlin

Per your request, please let this document serve as a Contract Agreement for Exterior Envelope Consulting Services to be provided at the Jefferson Davis Presidential Library (JDPL) located at 2244 Beach Blvd in Biloxi, Mississippi between the Roy Anderson Corporation and Water Management Consultants & Testing, Inc (referred to throughout this agreement as RAC and WMC).

WMC will work with RAC to develop a Scope of Work by type of work identified in the investigative report issued by WMC. WMC will provide a Consultant to work with RAC and the reconstruction/waterproofing contractor after demo of brick and prior to replacement of brick throughout the project to assist the waterproofing contractor in the establishment of waterproofing details.

WMC shall invoice at the following hourly rates. Consultant - $150.00 per hr, Technician - $95.00 per hr and clerical $55.00 per hr.

| Consultant | Estimated 5 weeks @ 40 hours a week | $30,000.00 |
| Technician | Estimated 6 weeks @ 40 hours a week | $22,800.00 |
| Clerical | Estimated 25 hours | $ 1,375.00 |

| Estimated expense: | | $54,175.00 |

Invoices will be submitted for services on a monthly basis at the commencement of the project. The invoice shall be considered past due if not paid within 30 days after the invoice date. WMC may, without waiving any claim or right against the RAC, and without liability whatsoever to RAC, suspend performance of the services. A service charge will be charged at 1.5% per month on the unpaid balance. In the event any portion or all of an account remains unpaid 60 days after billing, RAC shall pay cost of collection, including reasonable Attorney's fees.

WMC will determine the appropriate personnel in its employ to provide the services called for under the contract.

---

Phone: 850-837-1336          295 AZALEA DRIVE - SUITE 2          Fax: 850-269-1108
                                 Destin, Florida 32541
                              stopwater4u@watermc.net



# Water Management Consultants & Testing, Inc.

**TERMINATION OF SERVICES**

Either party may terminate this agreement upon 10 days written notice shall the other fail to perform his obligation hereunder. In the event of termination, RAC shall pay WMC for all services rendered and reimbursable expenses to the date of termination.

**LIMITATION OF LIABILITY**

WMC shall procure and maintain insurance policies with such coverage and in such amounts and for such a period of time, as it deems appropriate, or as required by and set forth in this agreement. RAC hereby agrees, that, to the fullest extent permitted by law, the total liability of WMC or of any representative of WMC to RAC for any and all injury, claims, losses, expenses, or damages whatsoever arising out of or in any way related to the project at issue or to this agreement from any cause or causes, including but not limited to WMC's negligence, errors, omissions, or breach of contract shall not exceed the total liability insurance limits currently in place, which limits as of the date of this contract are as set out in attached Certificate. WMC will maintain stated insurance limits throughout project, and will as appropriate, designate RAC as an additional insured, and furnish evidence of same to RAC. WMC will submit insurance Certificate identifying policy provisions and limits with this proposal (see attachment 1).

Should you have any questions, please do not hesitate to contact me. Otherwise, if you agree with the terms and conditions set forth in this letter, please sign in the space provided below.

Roy Anderson Corporation                Water Management Consultants & Testing, Inc.

Client: _____        WMC: _____

Date: _____         Date: _____



July 24, 2013                    Mississippi License #15737-SC

Roy Anderson Corp                **Project: Jeff Davis Library**
                                  Biloxi, Ms.

Attn: David Mauffray
Ph: 228 896-4000
[David.Mauffray@rac.com]
Drawings Acknowledged: Water Management Report dated
Addenda Received: none
**Base Bid:** Per Plans & Specs:

## Description of Work

Kemco proposes to furnish the labor, material and boom lifts and scaffolding to perform the
following scope of work at the exterior walls of the library:

- remove coping cap stone at parapet walls and replace with metal and membrane flashing
  assembly, reset existing cap stone
- remove brick at base of wall and all landings and floor lines where through wall flashing exist
  Install through wall flashing set in mastic and term bar at top of flashing and reinstall existing
  brick with weeps
- remove brick and thru wall flashing at top of cornice and install new through wall flashing per
  WMC report. Reinstall existing brick with new weeps
- remove brick around openings of windows, doors and curtainwall, install break metal and thru
  wall flashing, reinstall existing brick
- cut out and recaulk all brick CJ, cast stone joints and window perimeters
- EXCLUDE ANY ROOFING WORK AND COUNTER FLASHING RELATED TO THE ROOF
- EXCLUDE ANY CRANE RENTAL THAT MAY BE NEEDED TO LIFT ANY LARGE CAP
  STONE PIECES
- EXCLUDE WORK AT COLUMNS AWAY FROM BUILDING

- Estimated time to complete work is 5 months from start


## Total Base Bid: $1,125,000
   One million one hundred twenty five thousand dollars

---

**Qualification Notes**

- Pricing based upon mutually agreed to schedule and proper coordination of the work.
- Pricing is contingent on mutually agreeable contract terms and conditions and insurance certificates.
- All colors are to be selected from manufactures standard color chart.
- This proposal is good for thirty (30) days from today's date.

2420 Glenda Lane, Dallas, Texas 75229
Phone: 972-488-2999 Fax: 972-488-2929
www.kemcowaterproofing.com



- Owner/Contractor agrees to furnish complete access to work area free and clear of obstructions, dumpsters, toilet facilities, potable water and all electrical power as required, at no additional cost to Kemco.
- The products and methods recommended in this proposal are based on our visual survey of the existing conditions and our years of practical experience of resolving similar problems for our customers.
- Unforeseen conditions or circumstances are not assumed nor anticipated in the scope of work proposed above and will be brought to the client's attention immediately upon discovery by Kemco personnel for a prompt resolution.
- All work to be executed during normal business hours.
- Overhead Protection will not be required.

Sales Tax Included: No

Submitted By: Mike Kemna
mike@kemcoinc.com



2420 Glenda Lane, Dallas, Texas 75229
Phone: 972-488-2999 Fax: 972-488-2929
www.kemcowaterproofing.com

# SAUCIER BROS. ROOFING, INC.

*"Established 1946"*

300 Lameuse Street • P.O. Box 1459 • Biloxi, Mississippi 35533-1459 • Phone: (228) 436-3563 • Fax (228) 435-0539

## Bid Proposal

July 25, 2013

Attention: David Mauffray
Job Name: Roof Repairs at Jeff Davis Presidential Library
Job Address: Biloxi, MS

We propose to furnish labor and material to perform the following scope of work on the roof with seven skylights and the adjacent 140 sf roof:

Remove roof membrane, flashing, and insulation and properly dispose of said material
Adhere new tapered insulation system
Install new 2 ply modified bitumen roof membrane
Install new wall flashing
Install new scupper flashing
Install new roof drain sumps

Exclusions & Special Conditions:

1. Existing roof drains shall be re-used
2. No repair, replacement, or alteration of through wall flashing is included.
3. No removal, waterproofing, or repair of stone cap flashing is included.
4. Price includes all hoisting necessary for this scope of work
5. No mechanical or electrical work is included, unless noted
6. Will not furnish general liability insurance in excess of $2,000,000.00.

Roof Replacement Quote:      $72,000.00

- No sales tax is included
- Payment terms – Monthly invoice, Net 30 days.
- This proposal is subject to review if not accepted in 30 days.

Saucier Bros. Roofing, Inc.

Clement B. Saucier III
Vice President

1